Shervin Golshani, Esq. (SBN 297320)
Christopher J. Lee (SBN 330298)
**GOLSHANI LEE LLP**
10680 Treena Street, Suite 100
Phone (858) 360-6454
golshani@golshanilee.com
lee@golshanilee.com

Leticia Zecca Ross, Esq. (SBN 344344)
**ZECCA ROSS LAW FIRM P.C.**
7668 El Camino Real, 104-444,
Carlsbad, CA 92009
Phone (619) 782-0186
leticia@zeccarosslaw.com

Attorneys for Plaintiff, TECNOGRUAS.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TECNOGRUAS, a corporation registered in Chile;<br><br>                    Plaintiff,<br><br>v.<br><br>INTERNATIONAL TRANSPORTATION SERVICE LLC, a Delaware limited liability company; and DOES 1 to 10, inclusive;<br><br>                    Defendants. | Case No.:<br><br>**PLAINTIFF'S COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT;**<br>2. **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>3. **CONVERSION – CRANES;**<br>4. **CONVERSION – MONEY;**<br>5. **VIOLATION OF PENAL CODE SECTION 496;**<br>6. **INTENTIONAL MISREPRESENTATION/ FRAUDULENT CONCEALMENT;**<br>7. **SPECIFIC PERFORMANCE;**<br>8. **INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS;**<br>9. **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;**<br>10. **NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS;**<br>11. **DECLARATORY RELIEF**<br><br>**[DEMAND FOR JURY TRIAL]** |

**PLAINTIFF'S COMPLAINT**

COMES NOW Plaintiff, TECNOGRUAS, a corporation registered in Chile, by and through their attorneys of record, Golshani Lee LLP and Zecca Ross Law Firm P.C., and who hereby complains and alleges against INTERNATIONAL TRANSPORTATION SERVICE, and DOES 1 to 10, inclusive (hereinafter collectively referred to as "Defendants"), and each of them, as follows:

## THE PARTIES

1.     At all times mentioned herein, Plaintiff TECNOGRUAS (hereinafter "TECNOGRUAS" or "Plaintiff") was and is a corporation existing under the laws of Chile, with its principal place of business and headquarters in Av Santa Maria 2670 Of. 505. Torre B, Providencia, Santiago, Chile.

2.     At all times relevant to the subject matter of this litigation, INTERNATIONAL TRANSPORTATION SERVICE, LLC (hereinafter "ITS" or "Defendant") was and is a Delaware limited liability company existing under the laws of the State of Delaware, with its principal place of business and headquarters, where the corporation's officers direct, control, and coordinate the corporation's activities, in the State of California at 1281 Pier G E Long Beach, California 90802.

3.     The true names and capacities of Defendants DOES 1 to 10, inclusive, whether individual, corporate, associate, or otherwise, are presently unknown to Plaintiff, who, therefore, sues said Defendants by such fictitious names. Plaintiff is informed and believes, and based thereon alleges DOES 1 to 10, and each of them, proximately caused Plaintiff's damages as alleged herein, and are liable for the causes of action alleged. Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained, in accordance with California Code of Civil Procedure section 474.

4.     Plaintiff is informed and believes, and thereon alleges Defendants, and each of them, including those described herein as DOES, were at all times herein mentioned the employees, agents, representatives, joint venturers, and/or

partners of Defendants, and in doing the things hereinafter alleged, were acting within the purpose, course, and scope of such agency, employment, joint venture, partner relationship, and with the permission, consent, and ratification of Defendants.

## JURISDICTION AND VENUE

5.     This Court has personal jurisdiction over the Defendants, and each of them, as they were at all relevant times hereinafter mentioned engaged in the business of receipt and shipment of containerized cargo in domestic and foreign trade, focusing on marine cargo handling, vessel stevedoring, on-dock rail, and staffing services in the State of California.

6.     Jurisdiction in this matter is based upon diversity between the parties pursuant to 28 U.S.C. Section 1332 as there is diversity of citizenship and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.     This is an action for declaratory judgment pursuant to the Federal Declaratory Relief Act, 28 U.S.C. Section 2201, for purposes of determining an actual controversy between the parties.

## FACTUAL ALLEGATIONS

### The Crane Purchase and Sale Agreement/ Payment of Contract Price/ Contract with Dole operations in Guayaquil

8.     In or around 2022, Plaintiff retained the services of Pacific Handling Systems, Inc., an Oregon corporation, to find cranes unique in weight and height to be transported to Ecuador, more specifically to the Guayaquil port.

9.     Pacific Handling Systems, Inc. (hereinafter referred to as "Facilitator") found that three Mitsui-Paceco manufactured ship to shore cranes were posted for sale by ITS at Long Beach port, California. Facilitator was informed that ITS was the owner of the cranes. Plaintiff directed Facilitator to approach ITS for the purchase of the cranes.

10.     In October 2022, Plaintiff's Executives flew to California. After meeting with ITS, Plaintiff instructed Facilitator to begin discussions with ITS concerning the sale of the three Mitsui-Paceco manufactured ship to shore cranes. Attached to this Complaint as **Exhibit 1** and incorporated herein by reference is a true and correct copy of the emails between ITS and Facilitator regarding the negotiations of the sale of the cranes.

11.     After almost two years of negotiations, Plaintiff and ITS reached an agreed price for the sale of the cranes.  In order to discuss the terms of the agreement between the Parties, in February 2024, Plaintiff's CEO, Alejandro Guzmán Ayub, flew to Los Angeles to meet with ITS' Executives and inspect the cranes. Soon thereafter, ITS provided Plaintiff with a copy of a Crane Purchase and Sale Agreement dated March 7, 2024.

12.     Plaintiff and ITS entered into the Crane Purchase and Sale Agreement whereby ITS, (referred as "Seller") agreed to sell and transfer the title of three Mitsui-Paceco manufactured ship to shore cranes (cranes numbers 2502, 2767, and 2768 (the "Cranes") together with certain spreaders, spare spreader, manuals and drawings (collectively, with the Cranes, the "Equipment") to Plaintiff (referred as "Buyer") in exchange for the sum of Five Hundred Thousand United States Dollars ($500,000) (the "Contract Price"). Attached to this Complaint as **Exhibit 2** and incorporated herein by reference is a true and correct copy of the Crane Purchase and Sale Agreement.

13.     Plaintiff is informed and believes and thereon alleges that ITS did not execute the Crane Purchase and Sale Agreement until March 25, 2024, after alleging the need to obtain Board approval for the signature. Due to the delay by ITS in executing the Crane Purchase and Sale Agreement, the agreement went into effect nearly three weeks late and the deadline for Plaintiff to remove the cranes was extended by ITS to October 31, 2024. Attached to this Complaint as **Exhibit 3** and incorporated herein by reference is a true and correct copy of an email from

Halfdan Ross, ITS' Chief Project Officer, stating that ITS took the liberty to extend the deadline for the crane removal until the 31st of October and that ITS simply made that correction in handwriting (two places) in the documents.

14.    Pursuant to Section 7.4 of the Crane Purchase and Sale Agreement, Plaintiff (referred as "Buyer") was to commence work on Defendant's (referred as "Seller") Facility, i.e. in Long Beach, California, for the removal of the Equipment no later than April 15, 2024 (referred as "Work Date") and was to complete Buyer's Work no later than October 31, 2024, unless extended by reason of an applicable Force Majeure Event (referred as "Guaranteed Completion Date"). See **Exhibit 2**.

15.    Section 7.3 of the Crane Purchase and Sale Agreement states: "Time is of the essence for Buyer to remove the Equipment from Seller's Facility." See **Exhibit 2**.

16.    Section 7.4 of the Crane Purchase and Sale Agreement states that for each day Buyer failed to complete Buyer's Work by the Guarantee Completion Date, Buyer was to pay to Seller the amount of Five Hundred Dollars ($500) per day as a storage cost of the Equipment and Buyer's occupancy of Seller's Facility (the "Storage Costs"). See **Exhibit 2**.

17.    Attachment D of the Crane Purchase and Sale Agreement provides the Schedule of Buyer's Work. Attachment D states: "The WORK Plan discussed with the Contractor, and commissioned to the Contractor follow the below mentioned dates. The same, in line and considered for fulfillment of WORKS in the Agreement, are:

1.    Signature of Acquisition Agreement.

2.    Signature of HEAVY Lift Contractor (on or before April 15, 2024)

3.    Engineering calculations, Mobilization Equipment determination, and approval -see attached

**PLAINTIFF'S COMPLAINT**

4.      Mobilization of HEAVY Lift Contractor, to ITS Facilities – see attached

5.      Mobilization of Sea Vessel to pick-up Cranes in ITS Facilities – see attached

6.      LOADING of cranes unto Sea Vessel – see attached

7.      Sea Vessel DEPARTING from Long Beach to Ecuador; (no later than October 31st, 2024."

18.    Pursuant to Section 7.2 of the Crane Purchase and Sale Agreement, title of the Equipment was to pass to Buyer upon payment in full of the Contract Price.

19.    On April 29, 2024, Plaintiff wired the Contract Price to ITS pursuant to the terms of the Crane Purchase and Sale Agreement. Attached to this Complaint as **Exhibit 4** and incorporated herein by reference is a true and correct copy of the Wire Transfer. Plaintiff's payment included an additional $80,000.00 which served as commission for the Facilitator.

20.    Relying on the Crane Purchase and Sale Agreement, on March 13, 2024, Plaintiff, through its subsidiary in Ecuador, Inverequipos S.A., executed a contract with NAPORTEC S.A (herein referred as "Dole") with a value of approximately $38M USD to lease the Cranes for Dole's operations in Guayaquil. Attached to this Complaint as **Exhibit 5** and incorporated herein by reference is a true and correct copy of the contract executed between Inverequipos S.A and Naportec S.A., dated March 13, 2024 (the "Contrato de Servicios Portuarios").

21.    Plaintiff has been renting cranes since 1983. Because of Plaintiff's years of knowledge and reputation in this industry, Plaintiff became the go-to company in the business of renting heavy and port equipment in several countries in the American continents. The crane rental business is quite small, especially regarding high-tonnage cranes. Therefore, Plaintiff's good standing and reputation is its priority.

PLAINTIFF'S COMPLAINT

22.    Usually, the terminal's operations at the ports revolve around using their own equipment. However, sometimes they rent equipment from companies well-known in this field. In 2018, Dole reached out to Plaintiff regarding renting heavy and port equipment. Dole was in need of transitioning from mobile cranes to ship-to-shore cranes. Dole was expecting sales to increase after Guayaquil dredged the canal allowing larger ships to entry the port which would speed up the movement of containers at the port. Dole could not continue to operate with the cranes it had before. Therefore, on February 12, 2019, Plaintiff, through its subsidiary in Ecuador, Inverequipos S.A., executed an equipment lease contract with Dole. Attached to this Complaint as **Exhibit 6** and incorporated herein by reference is a true and correct copy of the contract executed between Inverequipos S.A and Naportec S.A., dated February 12, 2019 (the "Contrato de Servicios Portuarios").

23.    In 2022, the contract with Dole was extended when Dole asked Plaintiff to lease 3 more pieces of equipment, this time RTG cranes. At the end of 2022, it was evident that Dole would need to lease ship-to-shore cranes. For this reason, in 2022, Plaintiff began its search and engaged in negotiations with ITS to acquire the Cranes. Only after Dole confirmed the order for ship to shore cranes, Plaintiff executed the Crane Purchase and Sale Agreement with ITS. Relying on this Agreement, Plaintiff executed the contract with Dole, dated March 13, 2024. See **Exhibit 5**.

**Plaintiff's Performance under the Crane Purchase and Sale Agreement**
**(Negotiations with Nordholm)**

24.    After executing the Crane Purchase and Sale Agreement with ITS, Plaintiff engaged in negotiations with Nordholm Companies, Inc. ("Nordholm") to provide services, as the Heavy Lift Contractor, to remove the Cranes from the Port of Long Beach, California, to Guayaquil, Ecuador. The Cranes were to be loaded onto a ship and the vessel had to be secured for the voyage.

25.   Plaintiff was informed by Facilitator that Nordholm was the only company capable of handling the Buyer's Work as outlined in the Crane Purchase and Sale Agreement.

26.   In March 2024, Plaintiff's Executives flew to Seattle to meet Nordholm personnel to discuss the procedure of removing the cranes from the Port of Long Beach, California. Plaintiff and Nordholm agreed that $6.4M would be the total cost of removing the cranes to Ecuador. Nordholm explained that two contracts were needed in order to complete the work. One contract for engineering and one contract for the remaining work.

27.   On March 21, 2024, Plaintiff executed a quotation/design agreement, the "engineering contract," with Nordholm. Attached to this Complaint as **Exhibit 7** and incorporated herein by reference is a true and correct copy of the Nordholm Companies, Inc. Quotation/ Design Agreement.

28.   On March 27, 2024, Plaintiff wired the sum of $112,500 to Nordholm through Heavy Crane and Rigging, Inc.'s bank account. Heavy Crane and Rigging, Inc. is Plaintiff's company. This amount represents 75% of the engineering fees. Attached to this Complaint as **Exhibit 8** and incorporated herein by reference is a true and correct copies of the Funds Transfer Request Authorizations.

29.   As for the remaining work, Plaintiff informed Nordholm that Plaintiff would agree to pay the full amount of $6.4M for the removal of the cranes in exchange for a bank guarantee, payable on demand, if, for any reason, the Cranes did not reach Ecuadorian waters by December 31, 2024.

30.   The offer sheet for the crane relocation was to be converted to a BIMCO contract, but it was to expire at the end of March and was subject to obtaining a particular vessel. The BIMCO was delayed and, when received on April 30, 2024, it was rejected because it did not identify a vessel, there was no bond included, and only requirements for wire transfers from Plaintiff. The proposed contract left Plaintiff with a $6.4 million dollar exposure with no security

offered in the event of Nordholm's failure to perform. All efforts were made to have these deficiencies remedied until it became obvious that Plaintiff and Nordholm had reached an impasse. Attached to this Complaint as **Exhibit 9** and incorporated herein by reference is a true and correct copy of the BIMCO.

31.    On April 30, 2024, ITS was informed of the above problems in a personal meeting with Plaintiff's Executives, Alejandro Guzman, Alejandro Guzman Jr., and Facilitator representative, Mike Condon. At the time Mr. Halfdan Ross was informed of Plaintiff's concerns with Nordholm's ability to perform and the intention to shift to a new third-party contractor, Surf City Steel/ PCMC. Plaintiff also discussed the previous request of ITS's CEO to have the cranes moved to another terminal, express a willingness to do so. This alternative concept for moving the cranes was well received along with an offer to pass to Plaintiff permits already obtained by ITS from the Port Authority to move the three cranes. Attached to this Complaint as **Exhibit 10** and incorporated herein by reference is a true and correct copy of the Crane Transport System Load Verification for Harbor Industrial Services, Inc.

32.    In fact, back in 2023, during the negotiations for the sale of the Cranes, ITS expressed its plan to move the Cranes from Berth 236 to 235 where "cranes will be less in the way of" ITS' operations. See **Exhibit 1**.

33.    On May 1, 2024, ITS informed Plaintiff its approved plan for moving the Cranes where ITS had a signed contract to move the Cranes for the cost of $600,000. On May 24, 2024, Plaintiff emailed ITS agreeing with the plan to relocate the cranes but stated that the relocation would be an option at the end of August 2024, beginning of September 2024. Attached to this Complaint as **Exhibit 11** and incorporated herein by reference is a true and correct copy of the emails between Plaintiff and ITS regarding the removal of the Cranes from Berth 236 to 235.

**PLAINTIFF'S COMPLAINT**

34.     On June 4, 2024, Plaintiff purchased a special system for crane moves in Taiwan for approximatively $2.4M US dollars. This system is on a ship currently bound for the Port of Long Beach, originally with an estimated arrival date of July 18, 2024, now delayed to August 10, 2024. Attached to this Complaint as **Exhibit 12** and incorporated herein by reference is a true and correct copy of the Order Confirmation with the Taiwan company and the estimated date of arrival.

### ITS's Notice of Default and Notice of Termination

35.     On June 6, 2024, Plaintiff received, via email, what was identified as a "NOTICE OF DEFAULT UNDER CRANE PURCHASE AND SALE AGREEMENT". On the notice, ITS stated that: (1) Plaintiff was in default "for failure to perform various obligations under the Agreement", (2) Under Section 7.4, TECNOGRUAS was obligated to commence work on the ITS Facility for removal of the Equipment no later than April 15, 2024, and as of the date of the letter, the required work has not commenced; and (3) pursuant to Section 8.13, TECNOGRUAS was obligated to furnish to ITS A performance bond in the amount of One Million U.S. Dollars ($1,000,000) within fifteen (15) business days from the Agreement Effective Date on March 7, 2024, pursuant to Section 8.13, that failure to furnish the bond constitutes a default under the Agreement, and that as of the date of the letter, TECNOGRUAS has not furnished a performance bond. Attached to this Complaint as **Exhibit 13** and incorporated herein by reference is a true and correct copy of the Notice of Default under Crane Purchase and Sale Agreement.

36.     On June 7, 2024, Plaintiff replied to ITS' notice of default. Plaintiff stated it was extremely surprised by the contents of the letter since Plaintiff and Defendant were in constant communication regarding the removal of the Cranes, especially the communications between Plaintiff's officer, Alejandro Guzman Monsalve, and ITS' Chief Project Officer, Halfdan Ross, regarding the details for the relocation of the Cranes within the Port of Long Beach. Attached to this

Complaint as **Exhibit 14** and incorporated herein by reference is a true and correct copy of Plaintiff's Response to ITS' Notice of Default.

37.     In its response, Plaintiff addressed the performance bond, reminding ITS that Plaintiff, on repeated occasions, tried to communicate with ITS to approve the language for the bond to no avail. In fact, on May 9, 2024, Plaintiff emailed ITS informing that, due to the fact that Plaintiff is a Chilean corporation and all its banking lines are based in Chile, in order to provide ITS with a performance bond, the bond must be transmitted directly from Plaintiff's Chilean bank (Banco de Créditos e Inversiones) to ITS's bank (Bank of America), and that Plaintiff's bank had prepared the language but was awaiting ITS approval to send it to ITS' bank. After receiving no response, on May 15, 2024, Plaintiff sent a "GENTLE REMINDER" email. Again, on May 22, 2024, Plaintiff requested an update from ITS, no response was received.

38.     On June 18, 2024, the performance bond was issued. Attached to this Complaint as **Exhibit 15** and incorporated herein by reference is a true and correct copies of Plaintiff's emails to ITS regarding the need of ITS' approval of the language for the performance bond.  Attached to this Complaint as **Exhibit 16** and incorporated herein by reference is a true and correct copy of the Performance Bond.

39.     Plaintiff notes, in this industry and in this context, the main reason for a performance bond is to cover the cost to scrap a crane in the event of the buyer's failure to proceed and remove the crane. As informed above, Plaintiff, at all times, showed its intent to perform under the Crane Purchase and Sale Agreement, especially when, on April 29, 2024, Plaintiff wired the full amount of the Contract Price to ITS. See **Exhibit 4**.

40.     On June 13, 2024, instead of addressing Plaintiff's arguments raised in its letter dated June 7, 2024 (See **Exhibit 14**), and, thus, allow Plaintiff cure any unmet performance obligations pursuant to Section 10 of the Crane Purchase and

Sale Agreement, ITS restated the false arguments of failing to commence work by April 15, 2024, and providing the performance bond within fifteen (15) days from the Effective Date, clearly showing its intention to terminate the agreement between the Parties. Attached to this Complaint as **Exhibit 17** and incorporated herein by reference is a true and correct copy of ITS's response to Tecnogruas's letter.

41.     On June 16, 2024, once more, in good faith, Plaintiff tried to address ITS' arguments of default, and invited ITS to resolve the matter through a cooperative approach. Attached to this Complaint as **Exhibit 18** and incorporated herein by reference is a true and correct copy of Plaintiff's June 16, 2024 letter to ITS.

42.     Disregarding Plaintiff's response and request for a meeting to address the issues in the notice of default, on June 17, 2024, ITS sent to Plaintiff, via email, a document titled "TERMINATION OF CRANE PURCHASE AND SALE AGREEMENT" (the "Notice of Termination"). The Notice of Termination stated that: "ITS notified Tecnogruas that it was in default of various provisions of the Agreement on June 5, 2024. Under Section 10 of the Agreement, if Tecnogruas fails to fully and completely cure those defaults within 10 days, ITS is entitled to, among other things, terminate the Agreement and retain the full Contract Price. Under Section 7.2 of the Agreement, title to the Equipment will then 'automatically revert to [ITS].' Tecnogruas was well aware of the consequences when it signed, and then repeatedly breached, the Agreement." Attached to this Complaint as **Exhibit 19** and incorporated herein by reference is a true and correct copy of ITS' Notice of Termination.

43.     The Notice of Termination concluded saying that, since Plaintiff did not fully and completely cure the noticed defaults within 10 days, ITS was terminating the Agreement effectively immediately and was entitled to keep the Cranes *and* the full Contract Price, but that nonetheless ITS was "willing to return

**PLAINTIFF'S COMPLAINT**

the portion of the Contract Price actually received by ITS to Tecnogruas in the amount of five hundred thousand dollars ($500,000.00) (the "Settlement Refund")", *if and only if*, Tecnogruas agrees to: (1) waive any challenge to the default and termination; and (2) sign a full, complete, and binding settlement agreement and general release that includes confidentiality and non-disparagement clauses ("General Release"). See **Exhibit 19**.

44.     Pursuant to the terms of the Notice of Termination, Plaintiff was given less than 4 days to sign a waiver of its rights to raise any challenge to the default and termination, while ITS was to prepare the initial draft of the General Release which was to be negotiated by the parties no later than June 28, 2024. See **Exhibit 19**.

45.     The Notice of Termination instilled panic and fear in Plaintiff. It unilaterally claimed Plaintiff has lost the contract, the full contract price of $500,000.00, and any and all rights get its money back or proceed with the purchase of the cranes. The Notice of Termination imposed psychological hardship and worry to force Plaintiff to sign the purported waiver of rights in order to at least keep its $500,000.00. The Notice did not allow for any additional time to negotiate, discuss, or even understand what had happened.

46.     Plaintiff tried to discuss the matter with ITS but was told that the contract between the parties was terminated and negotiations of new terms were required for the purchase of the Cranes.

47.     Based on ITS' improper conduct in sending the termination and accompanying false threats which caused Plaintiff fear of economic hardship, not only to lose the Contract Price, but also the contract with Dole in Ecuador, Plaintiff signed the Notice of Termination under the impression that negotiations of terms of a new agreement would begin between the parties. On its letter, dated June 20, 2024, Plaintiff stated, "while we find ourselves in a situation where we have no choice but to accept the contract termination demanded, we must insist that this

**PLAINTIFF'S COMPLAINT**

scenario is calamitous for the future of our company. Therefore, if it is feasible or viable for you to initiate a new negotiation through a new contract, establishing new sales terms, substantially incrementing the price, and involving the contractor of your choice, we reiterate our keen interest in proceeding it as soon as possible." Attached to this Complaint as **Exhibit 20** and incorporated herein by reference is a true and correct copy of Plaintiff's response to the notice of termination, the signed waiver of claims and the chain of emails between the parties.

48.     ITS misrepresented the facts and that it was entitled to keep Plaintiff's $500,000.00 payment under California law. ITS intended Plaintiff to rely on its misrepresentations and in fact induced Plaintiff to accept the terms of the waiver to challenge the default and termination of the Crane Purchase and Sale Agreement under the false pretenses that (1) signing the document was the absolute only way to keep its $500,000.00 and (2) that signing the document would open the door for further negotiations of a new agreement for the sale of the Cranes.

49.     Plaintiff justifiably relied on ITS' misrepresentations and was given less than 4 days to sign and return the document.

50.     On June 26, 2024, Plaintiff received a Settlement Agreement and Release signed by ITS's Vice President of Compliance, Human Resources and Industrial Relations, Christopher Rapp, requesting Plaintiff's signature. Attached to this Complaint as **Exhibit 21** and incorporated herein by reference is a true and correct copy of Settlement Agreement and Release. Attached to this Complaint as **Exhibit 22** and incorporated herein by reference is a true and correct copy of Christopher Rapp's email, where he attached the Settlement Agreement and Release, and requested Plaintiff's signature.

51.     After reviewing the Settlement Agreement and Release, Plaintiff realized ITS had no intention to restart negotiations pertaining to the sale of the Cranes, that ITS had made significant misrepresentations to Plaintiff in an effort to cancel the Agreement, and Plaintiff did not sign the Settlement Agreement.

52.     On June 26, 2024, the Facilitator wrote to ITS and set forth Plaintiff's actions in furtherance of performance under the agreement signed by the parties. Instead of responding to Facilitator's email, as requested by Plaintiff, on July 3, 2024, ITS sent a revised settlement agreement, this time signed by Mr. Halfdan Ross. The email stated that "u[U]nderstanding that Tecnogruas has no additional comment on the terms of the settlement agreement, ITS is amenable to extend the deadline for finalization of the settlement agreement set forth in our June 17, 2024 termination notice from June 28, 2024 to **5pm PT on Friday, July 5, 2024.** To accept the extended offer, Tecnogruas must execute and return the settlement agreement by such time. If the parties are unable to agree on the terms of the General Release by this extended deadline, ITS reserves the right to, in its sole and unilateral discretion, abandon the General Release and retain the full Contract Price." See **Exhibit 22**. Attached to this Complaint as **Exhibit 23** and incorporated herein by reference is a true and correct copy of revised Settlement Agreement and Release, signed by Halfdan Ross.

### Motive behind ITS' improper notices of default and termination

53.     As previously stated, on June 6, 2024, Plaintiff was extremely surprised after receiving, via email, what was identified as a 'NOTICE OF DEFAULT UNDER CRANE PURCHASE AND SALE AGREEMENT." In the notice, ITS stated that Plaintiff was in default "for failure to perform various obligations under the Agreement", specifically that (1) under Section 7.4, Plaintiff was obligated to commence work on the ITS's Facility for removal of the Equipment no later than April 15, 2024, and as of the date of the letter, according to ITS the required work had not been commenced, and (2) pursuant to Section 8.13, Plaintiff was obligated to furnish to IT'S a performance bond within fifteen (15) business days from the Agreement Effective Date, and as of the date of the letter, TECNOGRUAS had not furnished the performance bond.

**a. Section 7.4**

54.  Pursuant to Section 7.4 of the Crane Purchase and Sale Agreement, Plaintiff was to commence work on Defendant's Facility for the removal of the Equipment no later than April 15, 2024, and was to complete Buyer's Work no later than October 31, 2024. See **Exhibit 2**.

55.  The Crane Purchase and Sale Agreement, on Section 7.4., does not define the meaning of "commence work on Defendant's Facility." The phrase is ambiguous. However, Attachment D to the Agreement, number 2., states: "Signature of HEAVY Lift Contractor (on or before April 15, 2024)". It is reasonable to assume that "commence work on Defendant's Facility" means to engage in negotiations to retain a third-party contractor as a Heavy Lift Contractor. It would be impossible for Plaintiff to commence the work on Defendant's Facility by preparing the Cranes for removal within less than 20 days after receiving the fully executed Agreement by ITS.

56.  Plaintiff took the reasonable and necessary steps to "commence work on Defendant's Facility." On March 14, 2024, Facilitator, on behalf of Plaintiff informed ITS, via email, of Plaintiff's intention to nominate third-party contractor Nordholm for the crane move. On March 20, 2024, Facilitator sent ITS the crane removal project schedule which was acknowledged and agreed upon by ITS in the email, dated March 28, 2024. In its response, ITS' Chief Project Officer, Halfdan Ross informs that as per his previous e-mail, "ITS is fine if your schedule extends further than end September. At the same time, the sooner you can start work on site, the more space we can give." Attached to this Complaint as **Exhibit 24** and incorporated herein by reference is a true and correct copy of the emails between Facilitator and ITS regarding the project schedule spreadsheet.

57.  ITS waived any and all arguments that Plaintiff had not adequately "commenced work" under the Agreement by April 15, 2024.

**PLAINTIFF'S COMPLAINT**

58.    In contracts where time is of the essence, delay in performance constitutes a material breach. *Johnson v. Alexander, 63 Cal. App. 3d 806, 813, 134 Cal. Rptr. 101 (Ct. App. 1976)*. However, "[a] party may waive strict performance by the other merely by failing to insist on it" *Press Rentals, Inc. v. Genesis Fluid Sols., Ltd., 2014 U.S. Dist., 2014 WL 31251, (N.D. Cal. Jan 3, 2014*) (citing *Morehead v. Scribner, 2009 Cal. App. Unpub., 2009 WL 874000, (Cal. Ct. App. Apr. 2, 2009*) (citing *Johnson v. Goldberg, 130 Cal App. 2d 571, 577, 279, P.2d 131 (1955*)). A time of the essence provision may also be waived when a party continues to deal with the nonperforming party after the date specified in the contract without establishing a new requirement. *Galdjie v. Darwish, 113 Cal. App. 4th 1331, 1342, 7 Cal. Rptr. 3d 178 (2003*). Here, the deadline alleged to have been missed was April 15, 2024. ITS did not raise any issues with the deadline or status of work until June 6, 2024, almost two months later.

59.    The Crane Purchase and Sale Agreement includes a limited "time is of the essence" provision which is narrowly tailored to the removal of the Equipment from Seller's Facility which is scheduled for October 31, 2024. Section 7.3 of the Crane Purchase and Sale Agreement states: "Time is of the essence for Buyer **to remove the Equipment from Seller's Facility**." See **Exhibit 2**.

60.    Additionally, an intent to make a particular date, or time, "the essence of the contract must be clearly, unequivocally and unmistakably shown by an express declaration. *Katemis v. Westerlind*, 120 Cal. App. 2d 537 (citing *Miller v. Cox*, 96 Cal. 339 (1892)). Under the Crane Purchase and Sale Agreement, the Plaintiff's only obligation covered by a "time is of the essence" provision is the complete removal of the Cranes from Defendant's facility, which is explicitly stated as due by October 31, 2024. There is still ample time for Plaintiff to fully perform this obligation and Plaintiff has every intent to do so.

61.    Even if there were a "time is of the essence" provision for the undefined "commence work" requirement, Defendant waived this when it offered

**PLAINTIFF'S COMPLAINT**

to move the Cranes from berth 236 to berth 235 to get them out of its way such that the impasse with Nordholm would not bear any impact upon the parties' performance under the Agreement. Additionally, ITS waived the allegation of material breach when it acknowledged and agreed with the project schedule to prepare the three Cranes for voyage, load the Cranes, charter of vessel and ship the Cranes to Ecuador be extended "further than end of September." ITS misrepresented that Plaintiff had breached the Agreement between the Parties and was in default for failure to perform Section 7.4 of the Agreement. See **Exhibit 24**.

**b.  Section 8.13**

62.     Pursuant to Section 8.13. of the Crane Purchase and Sale Agreement, "w[W]ithin fifteen (15) business days after the Effective Date, Buyer or its contractors, subcontractors, or suppliers shall furnish to Seller a performance bond (the "Performance Bond") in the amount of One Million U.S. Dollars ($1,000,000) in form and substance and from an issuer satisfactory to Seller in all respects as security for Buyer's obligations under this Agreement, including, but not limited to, the proper timely removal of the Equipment from Seller's Facility. Failure to furnish a performance bond shall be a default by Buyer under this Agreement."

63.     As informed above, Plaintiff, on repeated occasions, tried to communicate with ITS to approve the language for the bond to no avail. In fact, on May 9, 2024, Plaintiff emailed ITS informing that, due to the fact that Plaintiff is a Chilean corporation and all its banking lines are based in Chile, in order to provide ITS with a performance bond, the bond must be transmitted directly from Plaintiff's Chilean bank (Banco de Créditos e Inversiones) to ITS' bank (Bank of America), and Plaintiff's bank had prepared the language but was awaiting ITS approval to send it to ITS' bank. After receiving no response, on May 15, 2024, Plaintiff sent a "GENTLE REMINDER" email. Again, on May 22, 2024, Plaintiff requested an update from ITS, no response was received. On June 18, 2024, the performance bond was issued. See **Exhibit 15** and **Exhibit 16**.

**PLAINTIFF'S COMPLAINT**

64.     The Crane Purchase and Sale Agreement has no time is of the essence provision, but for the removal of the Equipment from Seller's Facility, which is scheduled for October 31, 2024. Section 7.3 of the Crane Purchase and Sale Agreement states: "Time is of the essence for Buyer **to remove the Equipment from Seller's Facility**." See **Exhibit 2**.

65.     Moreover, Plaintiff's performance pursuant to the terms of Section 8.13 of the Agreement was conditioned on ITS' approval of the Performance Bond language.

66.     Providing Plaintiff with an approval of the language for the Performance Bond was a condition precedent to Plaintiff's duty to perform under Section 8.13 of the Agreement. The issuance of a bond is time consuming and expensive. A rejection by ITS' bank would require Plaintiff to spend more financial resources to issue a second bond.

67.     Cal Civ Code § 1439 provides that "before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself." Further, § 1440 states that if a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party. Therefore, under the California Civil Code, Defendant erred in sending Plaintiff a Notice of Default as it relates to the Performance Bond because Defendant did not perform its own obligations of approving the Performance Bond "in form and substance" as required by Section 8.13 of the Crane Purchase and Sale Agreement.

68.     For these reasons, ITS misrepresented that Plaintiff has breached the Agreement between the Parties and was in default for failure to perform Section 8.13 of the Agreement.

**PLAINTIFF'S COMPLAINT**

69.    On both June 6, 2024, and June 17, 2024, ITS intentionally misrepresented that Plaintiff had breached the Crane Purchase and Sale Agreement.

70.    Plaintiff is informed and believes, and thereon alleges, that Defendant has decided to either keep the Cranes or sell them for more money.

### c.  Motive behind ITS's breach of contract: Biden Administration

71.    In February 2024, the Biden administration launched an initiative to increase port security in response to the accusations of spying and the near total monopoly of the market by Shanghai Zhenhau Heavy Industries (ZPMC) which claims 80 percent of the worldwide market for large container cranes. In the latest step, the U.S. Trade Representative Ambassador Katherine Tai announced plans to raise the tariff on ship-to-shore cranes to 25 percent effective August 1. Attached to this Complaint as **Exhibit 25** and incorporated herein by reference is a true and correct copy of a Maritime Executive news article regarding the administration initiative.

72.    In fact, the White House page, on May 14, 2024, posted actions of President Biden to protect businesses from China's Unfair Trade Practices. Among the initiatives, the tariff rate on ship-to-shore cranes was to increase from 0% to 25% in 2024. Attached to this Complaint as **Exhibit 26** and incorporated herein by reference is a true and correct copy of a White House post dated May 14, 2024.

73.    The American Association of Port Authorities (AAPA) estimates roughly $131 million in "new, unexpected costs" that ports will have to cover, potentially forcing terminal operators to "scale back" existing plans for new infrastructure. Attached to this Complaint as **Exhibit 27** and incorporated herein by reference is a true and correct copy of a Supply Chain Brain news article regarding the AAPA response to the administration initiative.

74.    AAPA stated that 35 cranes were under construction in China that would be delivered to US ports after the tariff implementation date of August1,

**PLAINTIFF'S COMPLAINT**

2024, and added that a recent survey of its members suggested at least an additional 61 cranes were expected to be ordered in the next five years to cater for expansion plans, and the tariffs could distort competition. And what does this represent? "For the many ports considering crane purchases but have not yet signed contracts, they now have new information they can factor into procurement decisions, allowing them to source STS cranes from other suppliers, shift funding from other projects, or delay acquisition".

75.    Because of the 25% tariff increase, the increase of infrastructure is directly negatively impacted by the tariff itself, meaning procuring ship-to-shore cranes just became way more expensive, meaning that if terminals wanted to change current infrastructure at the ports it would take a lot more money and take a lot more time. This means that the terminals have to use the existing cranes, in order to not impact the operation value of the services the terminals provide, meaning they make more money on operating the cranes today in the port, than the terminals could have made before the tariff went into effect. This also means that the resale value of a crane owned by a United States company increased at least 25%.

76.    Plaintiff is informed and believes, and thereon alleges, that ITS, based on the Biden administration initiative, manufactured false defaults by Plaintiff in order to keep the Cranes or resell them.

**Uniqueness of the Mitsui-Paceco Ship-to-Shores Cranes**

77.    The three Mitsui-Paceco manufactured ship to shore cranes (cranes numbers 2502, 2767, and 2768) that Plaintiff is to purchase from ITS are unique in weight and height, and in their capacity and capabilities. As such, they uniquely fit for the intended use in operations at the port of Guayaquil. They are equipped with a seismic isolation system to maintain port functions in the event of an earthquake. Attached to this Complaint as **Exhibit 28** and incorporated herein by reference is a true and correct copy of spec sheets and data for cranes numbers 2502, 2767, and

2768. Attached to this Complaint as **Exhibit 29** and incorporated herein by reference is a true and correct copy of Mitsui-Paceco brochure.

78.    Plaintiff entered into the Crane Purchase and Sale Agreement with the specific purpose to acquire Mitsui-Paceco manufactured ship to shore cranes, and transport them to the Port of Guayaquil, Ecuador. No other crane can substitute cranes numbers 2502, 2767, and 2768 bought by Plaintiff.

79.    Ecuador is a country known by its earthquakes. Ecuador had 17 earthquakes in the past 365 days. The largest one was this month in Guayaquil (4.4 magnitude).

80.    In relying on the Crane Purchase and Sale Agreement, Plaintiff executed a contract with Dole in Ecuador with a value of approximately $38M USD to lease the Cranes for Dole operations in Guayaquil.

81.    ITS was aware of Plaintiff's contract and economic relationship and even hosted the inspections of the Cranes by the Dole operations team whose members flew to California to assess the cranes in person.

82.    Plaintiff is informed and believes, and thereon alleges, that the Cranes are still located at the Berth 236 at the Port of Long Beach, California.

83.    Plaintiff paid full price for the cranes to ITS and ITS accepted the money.

84.    Pursuant to the terms of the Crane Purchase and Sale Agreement, the title and all risks associated with the cranes passed to Plaintiff upon payment of the contract price of $500,000.00 to ITS.

85.    Now, however, ITS has claimed it no longer has to sell the cranes and that it gets to keep Plaintiff's payment for the full value of the cranes.

86.    Plaintiff is informed and believes, and thereon alleges, that ITS is improperly operating the Cranes for which Plaintiff already paid in full. ITS' use or movement of the cranes increases the chances of them breaking or developing a malfunction.

87.     Moreover, ITS is improperly offering the Cranes for sale at the APM Terminals website. Attached to this Complaint as **Exhibit 30** and incorporated herein by reference is a true and correct copy of APM Terminals website. Attached to this Complaint as **Exhibit 31** and incorporated herein by reference is a true and correct copy of emails between Facilitator and a third-party asking whether the cranes are being offered for sale.

## FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

88.     Plaintiff repeats, re-alleges, and incorporates by this reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

89.     As set forth above, Plaintiff and ITS entered into the Crane Purchase and Sale Agreement on or about March 25, 2024.

90.     Pursuant to the Agreement, ITS was to sell 3 cranes to Plaintiff and Plaintiff was to have the cranes removed from ITS' property by October 31, 2024.

91.     Plaintiff paid IT'S the full contract price for the cranes under the Agreement.

92.     Plaintiff performed all, or substantially all, of its obligations, conditions, covenants, and promises under the Agreement with the exception of those excused by the acts or omissions of ITS.

93.     ITS sent Plaintiff a Notice of Default on June 6, 2024 alleging that Plaintiff had failed to perform two obligations:

a.      commencing work on ITS' facility for the removal of the cranes; and

b.      furnishing a Performance Bond to ITS.

94.     As to the Performance Bond, the Agreement explicitly states that the Performance Bond must be "in form and substance and from an issuer satisfactory to Seller [ITS]." See Section 8.13.

95.     Plaintiff had been trying to get ITS to approve the language for the Performance Bond since May 9, 2024, 28 days before the Notice of Default was sent.

96.     ITS failed to approve or even offer comments or suggestions as to the language it needed for the Performance Bond. As such, Plaintiffs bank was unable to issue the Performance Bond.

97.     As to the commencement of work, the term "commence work" (Section 7.4) is not a defined term of the contract and is ambiguous. At the time the Notice of Default was sent, Plaintiff had undertaken the following action to "commence work" for the removal of the cranes:

   a.     Paid $112,500 to Nordholm Companies as an advance for Nordholm to prepare engineering work as the Third Party Provider (Section 8.2) for the removal and loading of the cranes.

   b.     Informed ITS that the contract with Nordholm was not moving forward, through no fault of Plaintiff. Plaintiff then confirmed with ITS that it intended to use the option, provided by ITS, of moving the cranes from one berth to another.

   c.     Purchased 30 Axle Lines Goldhofer for approximately $2.4M USD from Taiwan to allow the cranes to be removed from the secondary berth on ITS' property. This equipment has since departed Taiwan and is due to arrive in Long Beach on August 10, 2024.

   d.     Began negotiating with Surf City Steel/PCMC to form a new Third Party Provider Agreement.

98.     ITS breached this contract by unilaterally terminating the Agreement without justification as there was and has been no default by Plaintiff requiring a cure.

99.     ITS failed to approve the language of the Performance Bond when it was presented to it, in violation of the terms of the Agreement.

100.   ITS has taken Plaintiff's payment of $500,000.00 and refused to perform its end of the bargain, continuing its use of the cranes after title and risk of loss passed to Plaintiff on May 1, 2024.

101.   ITS' breaches of the Agreement were a substantial factor in causing Plaintiff's harm.

102.   As a direct and foreseeable result of ITS' breach of contract, Plaintiff has incurred damages, including significant lost profits arising out of other contracts made in reliance on ITS' performance, in an amount to be established according to proof at the time of trial.

## SECOND CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

103.   Plaintiff repeats, re-alleges, and incorporates by this reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

104.   Under California law, in every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract or agreement. Defendant breached this covenant.

105.   The Crane Purchase and Sale Agreement was entered into and executed in California, was to be performed in California, and is governed by the laws of the State of California.

106.   ITS breached the covenant of good faith and fair dealing by, among other things, the acts and omissions set forth above, including:

a.   Continuing to use the cranes after title and risk of loss had passed to Plaintiff and without approval from Plaintiff;

b.   Continuing to offer the cranes for sale after the Agreement was executed and Plaintiff had paid the full contract price;

c.      Failing to approve the language on the Performance Bond as required by Section 8.13;

d.      Sending Plaintiff a Notice of Default where no default actually existed;

e.      Terminating the agreement without just cause;

f.      Fraudulently claiming it was entitled to simply keep all of the $500,000.00 contract price Plaintiff paid; and

g.      Forcing Plaintiff to execute a waiver of rights under duress by imposing a less than 4-day deadline and threatening Plaintiff with the complete loss of the $500,000.00 it paid unless it signed the termination letter and waiver.

107.   ITS inquired about potentially selling the cranes for too little money after learning of new tariffs being added to all new cranes being imported from China. ZPMC cranes coming from China make up 90% of the US market. ITS' inquiry was made after the Agreement was executed and its terms agreed to. This tariff was announced on May 14, 2024.

108.   ITS, to this day, continues to use and profit from the cranes without permission from Plaintiff. ITS has not offered any plans to maintain the cranes in the same working condition they were in when Plaintiff inspected and accepted them. ITS has not offered to compensate Plaintiff for use of its cranes.

109.   ITS never removed the cranes from the third-party site used to advertise the cranes for sale. The administrator of the listing has confirmed that ITS has intentionally left the listing active in order to find a new buyer.

110.   ITS knew of Plaintiff's contract with Dole in Guayaquil, Ecuador as it is referenced in the Agreement which identifies the cranes would be transported to Ecuador and Dole executives travelled from Ecuador and met ITS at its port in Long Beach to assess the cranes in person. ITS knew Plaintiff needed these cranes in order to fulfil its obligations under the contract with Ecuador. ITS has acted in

bad faith by failing to respond to Plaintiff as Plaintiff sought to fulfil each and every one of its obligations under this Agreement.

111.   As a direct and proximate result of the breach of the covenant of good faith and fair dealing by ITS, Plaintiff has suffered damages in an amount to be proven at time of trial.

112.   The acts described above by ITS are inconsistent with Plaintiff's reasonable expectations, contrary to established industry practices and legal requirements, contrary to industry custom and practice, contrary to the Parties' negotiations and agreements prior to and at the time of contracting, and contrary to the express terms of the Crane Purchase and Sale Agreement. The acts described above constitute a breach of the implied covenant of good faith and fair dealing.

113.   As a direct and proximate result of ITS' breaches of its obligations, and in mitigation of Plaintiff's own damages, Plaintiff has suffered, and continues to suffer, substantial damages and lost profits.

## THIRD CAUSE OF ACTION

## CONVERSION - CRANES

114.   Plaintiff repeats, re-alleges, and incorporates by this reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

115.   Plaintiff paid the full contract price of $500,000.00 for three cranes to ITS pursuant to the parties' Agreement.

116.   Pursuant to the Agreement, title transferred to Plaintiff upon full payment of the contract price. Nevertheless, ITS has continued to use and operate the cranes in violation of ITS' rights.

117.   ITS continues to wrongfully interfere with Plaintiff's interests in the aforementioned property even after repeated demands were made for ITS to comply with its obligations and acknowledge title belongs to Plaintiff.

**PLAINTIFF'S COMPLAINT**

118.   As a result of the acts of conversion by, Plaintiff has been damaged in an amount to be proven at trial. Plaintiff is further entitled to, and will seek compensation for, the time and money expended in pursuit of the converted sums.

119.   In engaging in the acts alleged herein, ITS acted with oppression, fraud, malice and in conscious disregard for the rights of Plaintiff, and Plaintiff is therefore entitled to punitive damages according to proof at the time of trial.

## FOURTH CAUSE OF ACTION

## CONVERSION – MONEY

120.   Plaintiff repeats, re-alleges, and incorporates by this reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

121.   Plaintiff paid the full contract price of $500,000.00 for three cranes to ITS pursuant to the parties' Agreement.

122.   ITS subsequently alleged that Plaintiff defaulted under the Agreement and that such alleged default permitted ITS to terminate the contract.

123.   In addition, ITS claimed it was entitled to keep the entire $500,000.00 contract sum Plaintiff paid to it, despite not providing Plaintiff with anything in return due to the termination of the Agreement.

124.   Even assuming ITS was entitled to terminate the Agreement at all, which ITS was not, ITS relied on an unenforceable and invalid provision in the Agreement providing for a penalty, forfeiture, and/or illegal liquidated damage sum in order to wrongfully keep Plaintiff's $500,000.00 payment.

125.   ITS continues to wrongfully interfere with Plaintiff's interests in the aforementioned sum of money. As a result of the acts of conversion by ITS, Plaintiff has been damaged in an amount to be proven at trial. Plaintiff is further entitled to, and will seek compensation for, the time and money expended in pursuit of the converted sums.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF PENAL CODE § 496**

126.   Plaintiff repeats, re-alleges, and incorporates by this reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

127.   Defendants unlawfully obtained possession of money and property as alleged herein, including but not limited to:

       a.   Falsely claiming that ITS could terminate the Agreement and refuse to permit Plaintiff to control, possess, and obtain the cranes that it paid in full for;

       b.   Falsely claiming that ITS could retain the full contract price paid by Plaintiff, in the sum of $500,000.00, despite terminating the Agreement; and

       c.   actually retaining the full contract price paid by Plaintiff in the sum of $500,000.00 despite no legal justification for doing so.

128.   ITS knew that the money and property was obtained through unlawful means, and ITS is in receipt of the unlawfully obtained money and property.

129.   As a direct and proximate result of ITS' conduct, Plaintiff has suffered significant damages in an amount subject to proof at trial.

130.   Plaintiff is authorized to bring this action for three times its actual damages, together with reasonable attorney's fees and costs, pursuant to Penal Code 496(c).

**SIXTH CAUSE OF ACTION**

**INTENTIONAL MISREPRESENTATION/ FRAUDULENT CONCEALMENT**

131.   Plaintiff repeats, re-alleges, and incorporates by this reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

132.   As set forth above, Plaintiff and ITS entered into the Crane Purchase and Sale Agreement whereby ITS agreed to sell and transfer the title of three

**PLAINTIFF'S COMPLAINT**

Mitsui-Paceco manufactured ship to shore cranes together with certain spreaders, spare spreader, manuals and drawings to Plaintiff in exchange for the sum of Five Hundred Thousand United States Dollars ($500,000.00).

133.  After execution of the Agreement, Plaintiff submitted full payment for the cranes to ITS in the amount of $500,000.00 and ITS accepted the funds.

134.  Plaintiff commenced work on removal of the cranes from ITS' property, which required extensive planning and work due to the sheer size and weight of the cranes at issue and the plan to transport them to Ecuador.

135.  On June 6, 2024, Plaintiff received a Notice of Default from ITS alleging Plaintiff was in default for failing to have "commenced work" by April 15, 2024 and for failing to obtain a performance bond. **Exhibit 13**.

136.  Plaintiff was extremely surprised by the notice, as the parties had a good line of communication and had been discussing various aspects of the work on a regular basis.

137.  The very next day, June 7, 2024, Plaintiff replied to ITS and addressed the allegations, asserting it was not under default and setting forth the reasons why. **Exhibit 14**.

138.  Plaintiff addressed the performance bond, reminding ITS that Plaintiff, on repeated occasions, tried to communicate with ITS to approve the language for the bond to no avail. In fact, on May 9, 2024, Plaintiff emailed ITS informing that, due to the fact that Plaintiff is a Chilean corporation and all its banking lines are based in Chile, in order to provide ITS with a performance bond, the bond must be transmitted directly from Plaintiff's Chilean bank (Banco de Créditos e Inversiones) to ITS's bank (Bank of America), and that Plaintiff's bank had prepared the language but was awaiting ITS approval to send it to ITS' bank. After receiving no response, on May 15, 2024, Plaintiff sent a "GENTLE REMINDER" email. Again, on May 22, 2024, Plaintiff requested an update from

**PLAINTIFF'S COMPLAINT**

ITS, no response was received. On June 18, 2024, the performance bond was issued. See **Exhibit 15** and **Exhibit 16**.

139.   Plaintiff also reiterated the steps taken since execution of the contract and reminded ITS that it had informed ITS of all updates and status regarding contractor Nordholm.

140.   Plaintiff tried to communicate with ITS and discuss the purported issues in good faith. However, seemingly with a plan in place, ITS refused. Rather, disregarding Plaintiff's response and request for a meeting to address the issues in the notice of default, on June 17, 2024, ITS sent to Plaintiff, via email, a document titled "TERMINATION OF CRANE PURCHASE AND SALE AGREEMENT."

141.   The Notice of Termination stated that: "ITS notified Tecnogruas that it was in default of various provisions of the Agreement on June 5, 2024. Under Section 10 of the Agreement, if Tecnogruas fails to fully and completely cure those defaults within 10 days, ITS is entitled to, among other things, terminate the Agreement and retain the full Contract Price. Under Section 7.2 of the Agreement, title to the Equipment will then 'automatically revert to [ITS].' Tecnogruas was well aware of the consequences when it signed, and then repeatedly breached, the Agreement." See **Exhibit 19**.

142.   The Notice of Termination concluded saying that, since Plaintiff did not fully and completely cure the noticed defaults within 10 days, ITS was terminating the Agreement effective immediately and was entitled to keep the Cranes and the full Contract Price, but that nonetheless ITS was "willing to return the portion of the Contract Price actually received by ITS to Tecnogruas in the amount of five hundred thousand dollars ($500,000.00) (the "Settlement Refund")", if and only if, Tecnogruas agrees to: (1) waive any challenge to the default and termination; and (2) sign a full, complete, and binding settlement agreement and general release that includes confidentiality and non-disparagement clauses ("General Release"). See **Exhibit 19**.

143.   Pursuant to the terms of the Notice of Termination, Plaintiff was given less than 4 days to sign a waiver of its rights to raise any challenge to the default and termination, while ITS was to prepare the initial draft of the General Release which was to be negotiated by the parties no later than June 28, 2024.

144.   The Notice of Termination instilled panic and fear in Plaintiff. It unilaterally claimed Plaintiff has lost the contract, the full contract price of $500,000.00, and any and all rights to get its money back or proceed with the purchase of the cranes. The Notice of Termination imposed psychological and economic hardship and worry to force Plaintiff to sign the purported waiver of rights in order to at least keep its $500,000.00. The Notice did not allow for any additional time to negotiate, discuss, or understand what had happened.

145.   Plaintiff tried to discuss the matter with ITS but was told that the contract between the parties was terminated and negotiations of new terms were required for the purchased of the Cranes. ITS intentionally led Plaintiff to believe that signed the termination letter and included waiver was the only way to reopen negotiations. Due to the severe losses Plaintiff would suffer were the Agreement to be terminated

146.   Based on ITS' improper conduct in sending the termination and accompanying false threats which caused Plaintiff fear of economic hardship, not only to lose the Contract Price, but also the contract with Dole in Ecuador, Plaintiff signed the Notice of Termination under the impression that negotiations of terms of a new agreement would begin between the parties. On its letter, dated June 20, 2024, Plaintiff stated that "while we find ourselves in a situation where we have no choice but to accept the contract termination demanded, we must insist that this scenario is calamitous for the future of our company. Therefore, if it is feasible or viable for you to initiate a new negotiation through a new contract, establishing new sales terms, substantially incrementing the price, and involving the contractor of your choice, we reiterate our keen interest in proceeding it as soon as possible."

**PLAINTIFF'S COMPLAINT**

Attached to this Complaint as Exhibit 20 and incorporated herein by reference is a true and correct copy of Plaintiff's response to the notice of termination, the signed waiver of claims and the chain of emails between the parties.

147.   ITS misrepresented the facts and that it was entitled to keep Plaintiff's $500,000.00 payment under California law. ITS intended Plaintiff to rely on its misrepresentations and in fact induced Plaintiff to accept the terms of the waiver to challenge the default and termination of the Crane Purchase and Sale Agreement under the false pretenses that (1) signing the document was the absolute only way to keep its $500,000.00 and (2) that signing the document would open the door for further negotiations of a new agreement for the sale of the Cranes.

148.   Plaintiff justifiably relied on ITS' misrepresentations and was given less than 4 days to sign and return the document.

149.   On June 26, 2024, Plaintiff received a Settlement Agreement and Release signed by ITS's Vice President of Compliance, Human Resources and Industrial Relations, Christopher Rapp, requesting Plaintiff's signature.

150.   After reviewing the Settlement Agreement and Release, Plaintiff realized ITS had no intention to restart negotiations pertaining to the sale of the Cranes and Plaintiff did not sign the Settlement Agreement.

151.   ITS intentionally misrepresented the purpose and legal effect of the notice of default and termination.

152.   Alternatively, ITS fraudulently concealed or failed to disclose facts relating to the purpose and effect of the notices in order to induce Plaintiff to sign the waiver to challenge the default and termination.

153.   ITS knew its statement was false when made.

154.   ITS intended Plaintiff rely on the misrepresentation or concealment/non-disclosure of facts regarding its right to a return of the contract price and its rights to dispute the alleged default and termination of the Agreement in order to induce Plaintiff to execute the waiver.

155.   As a direct, foreseeable and proximate result of ITS' intentional misrepresentation, Plaintiff has been harmed in an amount to be proven at trial.

156.   ITS' intentional misrepresentation was fraudulent, malicious, and oppressive within the meaning of Civil Code Section 3292, and justify an award of punitive damages, in an amount according to proof.

**SEVENTH CAUSE OF ACTION**

**SPECIFIC PERFORMANCE**

157.   Plaintiff repeats, re-alleges, and incorporates by this reference, as trough fully set forth herein, all preceding paragraphs of this Complaint.

158.   On March 7, 2024, Plaintiff and ITS entered into a Crane Purchase and Sale Agreement whereby ITS, (referred as "Seller") agreed to sell and transfer the title of three Mitsui-Paceco manufactured ship to shore cranes (cranes numbers 2502, 2767, and 2768 (the "Cranes") together with certain spreaders, spare spreader, manuals and drawings (collectively, with the Cranes, the "**Equipment**") to Plaintiff (referred as "Buyer") in exchange for the sum of Five Hundred Thousand United States Dollars ($500,000) (the "Contract Price").

159.   Section 1 of the Crane Purchase and Sale Agreement states: "Once this Agreement is signed by the Parties, Seller shall cease immediately using the Equipment for cargo handling operations or any main functions of the Cranes, using the spare parts among the Equipment, or performing any maintenance."

160.   On April 29, 2024, Plaintiff wired the Contract Price to Defendant pursuant to the terms of the Crane Purchase and Sale Agreement. Plaintiff agreed to and provided consideration to ITS. ITS has received the full contract price payment from Plaintiff.

161.   Under the terms of the Crane Purchase and Sale Agreement, nad in exchange for the contract price payment which has been made and received, Plaintiff has until October 31, 2024, to remove the Cranes from ITS' facility.

162.   The terms of the Agreement are sufficiently certain to support an action for specific performance. The specific performance requested is identical to that required by the Agreement.

163.   The Agreement is just and reasonable as to ITS as it has received full payment for the cranes and Plaintiff has until October 31, 2024 to remove the cranes from ITS' property otherwise specified penalties including daily storage fees come into play in favor of ITS.

164.   Any alleged failure to perform conditions precedent on the part of Plaintiff is either incorrect, only partial, and/or entirely immaterial and/or capable of being fully compensated and resolved.

165.   Plaintiff was ready, willing, and able to perform at the time the contract was entered into and continues to be ready, willing, and able to perform under the contract during this action for specific performance.

166.   ITS has expressly repudiated the aforementioned contractual obligations. ITS unilaterally terminated the contract on grounds Plaintiff allegedly defaulted and failed to cure such defaults. However, as alleged in detail hereinabove, the purported defaults were not defaults at all, but were either the result of ITS' own conduct (the performance bond) or a fabricated default made on a self-serving interpretation of an ambiguous contract term.

167.   ITS has the lawful power to perform its aforementioned contractual obligations to complete the sale of the cranes to Plaintiff.

168.   Plaintiff is entitled to specific performance. Money damages would be inadequate to compensate Plaintiff for ITS' failure to transfer the cranes because the cranes at issue are unique and cannot be located and purchased elsewhere. There is no adequate remedy at law for ITS' breach.

## **EIGHTH CAUSE OF ACTION**

**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

169.   Plaintiff repeats, re-alleges, and incorporates by this reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

170.   On March 13, 2024, Plaintiff entered into a valid contract with Dole in Ecuador for the lease of cranes to Dole valued at approximately $38M US Dollars.

171.   ITS is not a party to the contract.

172.   ITS was fully aware of the contract, which was not only referenced in the Agreement between Plaintiff and ITS wherein it was identified that the Cranes would be transported to Ecuador, but Dole executives also came to ITS' property to assess the cranes in person, and ITS knew of their purpose and met directly with them on ITS' property for the inspection.

173.   ITS' conduct outlined herein this action was designed to induce a breach of the contract between Plaintiff and Dole.

174.   ITS knew a necessary consequence of its actions would be to render Plaintiff's performance under the Dole contract impossible.

175.   ITS' conduct was substantially certain to cause interference with Plaintiff's contract with third-party Dole.

176.   ITS' wrongful termination of the Agreement between Plaintiff and ITS has resulted in Plaintiff's breach of the contract with Dole and a disruption of the contractual relationship between Plaintiff and Dole. ITS's conduct has rendered Plaintiff's performance exponentially more costly, if not outright impossible.

177.   But for ITS' actions, Plaintiff would and could have performed under its contract with Dole.

178.   Plaintiff has suffered significant damages as a result of ITS' intentional interference with Plaintiff's contractual relations in an amount to be proven at trial.

**PLAINTIFF'S COMPLAINT**

179.   ITS' intentional interference with Plaintiff's contractual relations was intentional, fraudulent, malicious, and/or oppressive within the meaning of Civil Code Section 3294, and justifies an award of punitive damages, in an amount according to proof.

## NINTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH
### PROSPECTIVE ECONOMIC RELATIONS

180.   Plaintiff repeats, re-alleges, and incorporates by this reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

181.   Plaintiff and Dole had an existing relationship likely to result in economic benefits to Plaintiff. Indeed, Plaintiff and Dole's relationship dated back to 2022.

182.   ITS was fully aware of the relationship between Plaintiff and Dole, which was not only referenced in the Agreement between Plaintiff and ITS wherein it was identified that the Cranes would be transported to Ecuador for the purpose of being leased to Dole, but Dole executives also came to ITS' property to assess the cranes in person, and ITS knew of their purpose and met directly with them on ITS' property for the inspection.

183.   ITS' conduct outlined herein this action was designed to disrupt the relationship between Plaintiff and Dole.

184.   ITS knew a necessary consequence of its actions would be to interfere with Plaintiff and Dole's relationship and negatively impact the likelihood of economic benefits to Plaintiff as a result of that relationship.

185.   ITS' wrongful termination of the Agreement between Plaintiff and ITS has disrupted Plaintiff's economic relationship with Dole and severely impacted Plaintiff's value to Dole. ITS used duress to force Plaintiff to execute a waiver of rights and to attempt to force Plaintiff to accept an otherwise illegal and invalid termination and penalty.

**PLAINTIFF'S COMPLAINT**

186. But for ITS' actions, Plaintiff would and could have obtained economic benefits from its relationship with Dole. ITS' conduct has rendered Plaintiff's performance more expensive, burdensome, or outright impossible, thus entirely eliminating the prospective economic relations between Plaintiff and Dole.

187. Plaintiff has suffered significant damages as a result of ITS' intentional interference with Plaintiff's contractual relations in an amount to be proven at trial.

188. ITS' intentional interference with Plaintiff's economic relations was intentional, fraudulent, malicious, and/or oppressive within the meaning of Civil Code Section 3294, and justifies an award of punitive damages, in an amount according to proof.

## TENTH CAUSE OF ACTION

## NEGLIGENT INTERFERENCE WITH
## PROSPECTIVE ECONOMIC RELATIONS

189. Plaintiff repeats, re-alleges, and incorporates by this reference, as though fully set forth herein, all preceding paragraphs of this Complaint.

190. Plaintiff and Dole have an economic relationship that has a probability of yielding future economic benefits.

191. On March 13, 2024, Plaintiff entered into a valid contract with Dole in Ecuador for the lease of cranes to Dole valued at approximately $38M US Dollars.

192. ITS is not a party to the contract.

193. ITS was fully aware of the contract, which was not only referenced in the Agreement between Plaintiff and ITS wherein it was identified that the Cranes would be transported to Ecuador, but Dole executives also came to ITS' property to assess the cranes in person, and ITS knew of their purpose and met directly with them on ITS' property for the inspection.

194.   ITS owed Plaintiff a duty based on the Agreement between Plaintiff and ITS, the implied covenant of good faith and fair dealing, and the circumstances wherein ITS sold Plaintiff cranes which Plaintiff was to lease to third-party Dole.

195.   ITS' unilateral breach and termination of the Agreement was certain to cause Plaintiff harm with respect to its contract with Dole. It was entirely foreseeable. ITS' conduct is inextricably intertwined with Plaintiff's injury with respect to its contract with Dole.

196.   ITS' conduct was a breach of the duties it owed to Plaintiff, by way of its fraudulent unilateral termination of the Agreement, including inducing Plaintiff to execute a waiver of rights by use of threats establishing economic duress.

197.   ITS knew a necessary consequence of its actions would be to render Plaintiff's performance under the Dole contract impossible.

198.   ITS' conduct was substantially certain to cause interference with Plaintiff's contract with third-party Dole.

199.   ITS' wrongful termination of the Agreement between Plaintiff and ITS has resulted in Plaintiff's breach of the contract with Dole and a disruption of the contractual relationship between Plaintiff and Dole. ITS' conduct has rendered Plaintiff's performance exponentially more costly, if not outright impossible.

200.   But for ITS' actions, Plaintiff would and could have performed under its contract with Dole. Plaintiff has suffered significant damages as a result of ITS' intentional interference with Plaintiff's contractual relations in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

## DECLARATORY RELIEF (Against All Defendants)

201.   Plaintiff repeats, re-alleges, and incorporates by this reference, as trough fully set forth herein, all preceding paragraphs of this Complaint.

202.   As set forth above, ITS, among other things, agreed to sell three cranes to Plaintiff pursuant to the terms of the Agreement between the parties. Plaintiff paid and ITS accepted the full contract price of $500,000.00.

203.   A dispute has arisen between Plaintiff and ITS in that Plaintiff contends ITS is in breach of the Agreement if it does not provide the cranes to Plaintiff and permit Plaintiff to do the necessary work to remove the cranes from ITS' property. Plaintiff is informed and believes and thereon alleges that ITS unreasonably contends otherwise.

204.   An actual controversy exists between Plaintiff and ITS regarding the Parties' rights and obligations under the Crane Purchase and Sale Agreement. Plaintiff contends and Defendant disputes the following:

    a.    Section 10 of the Agreement, which provides that, "in the case of a Buyer default, Seller's right to retain the Contract Price," is an unenforceable and invalid penalty, forfeiture, and/or liquidated damage;

    b.    The limitation of liability provisions in the Agreement at Sections 7.6 and 7.7 are unenforceable and invalid and unconscionable; and

    c.    Plaintiff's purported waiver of its right to challenge the default and termination of the Agreement is invalid as it was obtained under duress and by fraudulent practices.

205.   A declaratory judgment is necessary and appropriate to determine the rights and duties of the parties.

## **PRAYER**

WHEREFORE, PLAINTIFF prays for judgment against DEFENDANTS as follows:

### **ON THE FIRST AND SECOND CAUSES OF ACTION**

1.    For compensatory and consequential damages according to proof, but in an amount within the jurisdiction of this Court;

**PLAINTIFF'S COMPLAINT**

## ON THE THIRD AND FOURTH CAUSES OF ACTION

2.　　For compensatory damages according to proof, but in an amount within the jurisdiction of this Court;

3.　　For punitive and exemplary damages according to proof;

## ON THE FIFTH CAUSE OF ACTION

4.　　For compensatory damages according to proof, but in an amount within the jurisdiction of this Court;

5.　　For treble damages;

6.　　For attorneys' fees and costs;

## ON THE SIXTH CAUSE OF ACTION

7.　　For compensatory and consequential damages according to proof;

8.　　For punitive and exemplary damages according to proof;

## ON THE SEVENTH CAUSE OF ACTION

9.　　For specific performance pursuant to the Agreement;

## ON THE EIGHTH AND NINTH CAUSE OF ACTION

10.　　For compensatory and consequential damages according to proof;

11.　　For punitive and exemplary damages according to proof;

## ON THE TENTH CAUSE OF ACTION

12.　　For compensatory and consequential damages according to proof, but in an amount within the jurisdiction of this Court;

## ON THE ELEVENTH CAUSE OF ACTION

13.　　For a declaratory judgment that Section 10 of the Agreement, which provides that, "in the case of a Buyer default, Seller's right to retain the Contract Price," is an unenforceable and invalid penalty, forfeiture, and/or liquidated damage;

14.　　For a declaratory judgment that the limitation of liability provisions in the Agreement at Sections 7.6 and 7.7 are unenforceable and invalid and unconscionable;

**PLAINTIFF'S COMPLAINT**

15.    For a declaratory judgment that Plaintiff's purported waiver of its right to challenge the default and termination of the Agreement is invalid as it was obtained under duress and by fraudulent practices;

## ON ALL CAUSES OF ACTION

16.    For costs of suit herein; and

17.    For all such other and further relief as the Court may deem just and proper.

Dated: July 16, 2024            **GOLSHANI LEE LLP**

By:    */s/ Shervin Golshani*
Shervin Golshani, Esq.
Christopher J. Lee, Esq.
Attorneys for Plaintiff,
TECNOGRUAS

Dated: July 16, 2024            **ZECCA ROSS LAW FIRM P.C.**
By: __*/s/*__
Leticia Zecca Ross, Esq.
Attorneys for Plaintiff,
TECNOGRUAS.

**PLAINTIFF'S COMPLAINT**

# DEMAND FOR JURY TRIAL

PLAINTIFF hereby demands a jury trial as provided by Rule 38(a) of the Federal Rule of Civil Procedure.

Dated: July 16, 2024

**GOLSHANI LEE LLP**

By:    */s/ Shervin Golshani*
       Shervin Golshani, Esq.
       Christopher J. Lee, Esq.
       Attorneys for Plaintiff,
       TECNOGRUAS

Dated: July 16, 2024

**ZECCA ROSS LAW FIRM P.C.**

By:    */s/ Leticia Zecca Ross*
       Leticia Zecca Ross, Esq.
       Attorneys for Plaintiff,
       TECNOGRUAS

**PLAINTIFF'S COMPLAINT**