Shervin Golshani, Esq. (SBN 297320)
Christopher J. Lee (SBN 330298)
**GOLSHANI LEE LLP**
10680 Treena Street, Suite 100
Phone (858) 360-6454
golshani@golshanilee.com
lee@golshanilee.com

Leticia Zecca Ross, Esq. (SBN 344344)
**ZECCA ROSS LAW FIRM P.C.**
7668 El Camino Real, 104-444,
Carlsbad, CA 92009
Phone (619) 782-0186
leticia@zeccarosslaw.com

Attorneys for Plaintiff, TECNOGRUAS

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TECNOGRUAS, a corporation registered in Chile;<br><br>Plaintiff,<br><br>v.<br><br>INTERNATIONAL TRANSPORTATION SERVICE LLC, a Delaware limited liability company; and DOES 1 to 10, inclusive;<br><br>Defendants. | Case No.: 2:24-cv-05984<br><br>**PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>[Declarations of Guzman and Golshani; and [Proposed] Order Filed Concurrently Herewith] |

Plaintiff TECNOGRUAS ("Plaintiff") will and hereby does apply to this Court *ex parte* for a temporary restraining order ("TRO") and an Order to Show Cause ("OSC") requiring Defendant INTERNATIONAL TRANSPORTATION SERVICE, LLC ("Defendant" or "ITS") to show cause why a preliminary injunction should not issue. Specifically, Plaintiff requests a TRO and Preliminary Injunction as follows:

    a. Prohibiting ITS and its officers, owners, agents, employees, affiliates, and all persons in active concert or participation with ITS from doing any of the following:

        i. operating the three Mitsui-Paceco manufactured ship to shore cranes that are the subject of the Crane Purchase and Sale Agreement between ITS and Plaintiff and identified as cranes numbers 2502, 2767, and 2768 (the "Cranes");

        ii. moving or relocating the Cranes without Plaintiff's prior approval;

        iii. advertising the Cranes for sale on the APM Terminals listings or elsewhere; and

        iv. selling the Cranes.

Notice of this Application was given via email on July 17, 2024 to Counsel who has indicated they represent ITS with respect to the underlying controversy:

Eduardo Carvajal, Esq.
Erik Wilson, Esq.
ATKINSON, ANDELSON, LOYA, RUUD & ROMO
12800 Center Court Drive, Suite 300
Cerritos, California 90703.
Eduardo.Carvajal@aalrr.com
Erik.Wilson@aalrr.com

This application is made pursuant to the provisions of Federal Rules of Civil Procedure Rule 65. Plaintiff has not previously applied to any judicial officer for similar relief. This application is based on this notice, the Complaint filed in this case, the attached memorandum of points and authorities, the declarations of

**PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Alejandro Guzman and Shervin Golshani and exhibits submitted therewith, and on any other oral and documentary evidence that may be submitted and allowed by the Court.

Dated: July 17, 2024                    **GOLSHANI LEE LLP**

                                        By:   */s/ Shervin Golshani*
                                              Shervin Golshani, Esq.
                                              Christopher J. Lee, Esq.
                                              Attorneys for Plaintiff
                                              TECNOGRUAS

Dated: July 17, 2024                    **ZECCA ROSS LAW FIRM P.C.**

                                        By:   */s/Leticia Zecca Ross*
                                              Leticia Zecca Ross, Esq.
                                              Attorneys for Plaintiff,
                                              TECNOGRUAS

**PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS AND AUTHORITIES</u>

I.     INTRODUCTION ........................................................................... 1

II.    BACKGROUND ............................................................................ 1

    A. <u>Crane Purchase and Sale Agreement</u> ..................................... 1

    B. <u>Commencing Work on the Movement of the Cranes</u>……………………… 2

    C. <u>Defendant's Continued Use of the Cranes</u>……………………………….... 3

    D. <u>Notice of Default</u>……………………………………………………… 4

    E. <u>Commencing Work on the Movement of the Cranes</u>……………………… 5

III.   LEGAL STANDARD ................................................................... 6

IV.   LEGAL ARGUMENT ................................................................. 7

    A. <u>Movant's Likelihood of Success</u> ........................................... 7

        1.   Performance Bond……………………………………………..7

        2.   Commence Work on ITS' Facility…………………………………8

    B. <u>Irreparable Harm</u> .................................................................. 10

        1.   The Cranes are Unique…………………………………………..10

        2.   Plaintiff May Not Recover Adequate Money Damages Due to ITS' Assertion of a Limitaiton of Liability Clause…………………………...10

        3.   Loss of Business, Injury to Goodwill, Injury to Reputation………………12

    C. <u>Balance of Equities</u> .............................................................. 13

    D. <u>Public Interest</u> ..................................................................... 14

    E. <u>No Bond Should be Required</u> ................................................ 14

V.    CONCLUSION .......................................................................... 15

i

1

**Cases**                                                                          **Page**

2

*Alliance of the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011)…… …… …… …… … .......................... 7

3

*Biomedical Device Consultants v. Vivitro Labs, Inc.,*

4
    689 F. Supp. 3d 749 …… …… …… … … …… …........................... 7

5

*Carberry v. Trentham,*
    143 Cal. App. 2d 83 (1956)…… …… …… … .......................... 9

6

*Celsis In Vitro, Inc. v. CellzDirect, Inc.,*

7
    (2012) 664 F33d 922…… …… … …… …........................... 12

8

*Doran v. Salem Inn, Inc.,*
    (1975) 422 US 922…… …… … …… …........................... 12

9

*Grand River Enterprise Six Nations, Ltd. v. Pryor,*

10
    (2nd Cir. 2007) 481 F.3d 60…… …… …… … .......................... 12

11

*Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers,*
    415 U.S. 423 (1974)…… …… …… … …… …........................... 7

12

*Herb Reed Enterprises, LLC v. Florida Entertainment Mgmt., Inc.,*

13
    (9th Cir. 2013) 736 F.3d 1239…… …… …… … .......................... 12

14

*Katemis v. Westerlind.*
    120 Cal. App. 2d 537…… …… … …… …........................... 9

15

*Miller v. Cox,*

16
    96 Cal. 339 (1892)…… …… … …… …........................... 9

17

*Pacific Decision Sciences Corp. v. Superior Court,*
    (2004) 18 Cal.Rptr.3d 104…… …… …… … .......................... 10

18

*Reuters Ltd. v. United Press Int'l, Inc.,*

19
    903 F.2d 904 (2nd Cir. 1990)…… …… …… … .......................... 10

20

*Starlight Sugar, Inc. v. Soto,*
    114 F.3d 330 (1st Cir. 1997)…… …… …… … .......................... 10

21

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.,*

22
    (9th Cir. 2001) 240 F.3d 832…… …… … …… …........................... 12

23

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)…… …… …… … …… …........................... 7

24

*United Healthcare Ins. Co. v. Advance-PCS,*

25
    (8th Cir. 2002) 316 F.3d 737…… …… … …… …........................... 12

26

27

28

**TABLE OF CONTENTS AND AUTHORITIES**

**Statutes** **Page**

*California Civil Code § 1439* ........................................................................... 7

*California Civil Code § 1440* ........................................................................... 8

**TABLE OF CONTENTS AND AUTHORITIES**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff TECNOGRUAS ("Plaintiff" or "Tecnogruas") moves for an order temporarily enjoining Defendant INTERNATIONAL TRANSPORTATION SERVICE, LLC ("Defendant" or "ITS") from using, operating, selling, or relocating the Cranes identified as numbers 2502, 2767, and 2768, until Plaintiff's Complaint has been ruled upon. Plaintiff entered into an agreement to purchase the Cranes from ITS. Plaintiff paid the full purchase price to ITS. In reliance on the agreement, Plaintiff then expended significant resources and entered into a separate agreement with a third-party. Thereafter, ITS unilaterally terminated the agreement without legal justification and obtained a waiver from Plaintiff under duress to challenge the termination.

In order to preserve the *status quo* between the parties, Plaintiff applies to this Court, pursuant to Federal Rule of Civil Procedure 65, for a temporary restraining order and order to show cause why a preliminary injunction should not be issued. Without such an order enjoining ITS from using, operating, selling, or relocating the Cranes identified as numbers 2502, 2767, and 2768, until Plaintiff's Complaint has been ruled upon, ITS will continue to use, operate, and post for sale Cranes numbers 2502, 2767, and 2768 and Plaintiff will suffer irreparable harm should they be sold to a bona fide purchaser or as a result of the risk of them breaking or developing a malfunction. Plaintiff is informed and believes based on information received today that a purchaser is on site today, July 17, 2024, to purchase and move the Cranes immediately.

## II.    BACKGROUND

### A.    Crane Purchase and Sale Agreement

Plaintiff has been in the crane rental and operation business since 1983. *See* Declaration of Alejandro Guzman ("Guzman Decl.") ¶ 2. It is a relatively small niche industry, especially in regard to high-tonnage cranes. *Id.* at ¶ 3. Plaintiff has

1

worked hard since 1983 to develop its reputation and goodwill in the industry, becoming the go-to company for this work in several countries in the American Continents. *Id.* at ¶ 4. On March 7, 2024, Plaintiff and ITS entered into the Crane Purchase and Sale Agreement whereby ITS agreed to sell and transfer the title of three Mitsui-Paceco manufactured ship to shore cranes, cranes numbers 2502, 2767, and 2768 (the "Cranes"), together with certain spreaders, spare spreader, manuals and drawings (collectively, with the Cranes, the "Equipment") to Plaintiff in exchange for the sum of Five Hundred Thousand United States Dollars ($500,000.00) (the "Contract Price"). *Id.* at ¶ 7, **Ex. 1**.

In reliance on the Crane Purchase and Sale Agreement, on March 13, 2024, Plaintiff executed a contract with NAPORTEC S.A (hereinafter "Dole") in Ecuador with a value of approximately $38M USD to lease the Cranes for Dole operations at the Port of Guayaquil. *Id.* at ¶ 8**, Ex. 2.** Before executing the Contract with Dole, executives from Dole travelled on site in Long Beach, California to evaluate and assess the fitness and condition of the Cranes for the proposed project. *Id.* at ¶ 6. ITS was aware of the contract between Plaintiff and Dole and of the visit by Dole Executives. *Id*. The Dole executives met directly with ITS during this site visit and inspection. *Id.* By or before May 1, 2024, Plaintiff wired the full Contract Price to ITS who received and accepted the funds. *Id.* at ¶ 9

**B.  Commencing Work on the Movement of the Cranes**

Under the terms of the Crane Purchase and Sale Agreement, Plaintiff was to "commence work" by April 15, 2024. (Ex. 1, Section 7.4). The phrase "commence work" is not defined in the Agreement and is ambiguous, however an attachment to the Agreement provides Plaintiff was to engage with a Heavy Lift Contractor for the removal of the Cranes by April 15, 2024. (Ex. 1, Attachment D). ITS informed Plaintiff that Nordholm Companies, Inc. ("Nordholm") was the only company capable of handling work of this kind at ITS' facility. *Guzman Decl. at* ¶ 10. As

**PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

such, Plaintiff engaged in negotiations with Nordholm to provide Heavy Lift Contractor services in removing the Cranes from the Port of Long Beach, California to Guayaquil, Ecuador. *Id.* On March 27, 2024, before the Crane Purchase and Sale Agreement was even signed by ITS, Plaintiff wired a deposit of $112,000 to Nordholm as a deposit towards the engineering work relating to removal of the Cranes. *Id.* at ¶ 11.

While Nordholm came recommended from ITS, its relationship with Plaintiff deteriorated when Nordholm delayed the BIMCO until April 30, 2024. *Id.* at ¶ 12. When the BIMCO was received by Plaintiff, it had no choice but to reject it for being wholly incomplete and subjecting Plaintiff to a $6.4M liability with no bond protection from Nordholm in the event it failed to complete the task. *Id.* Plaintiff used its best efforts to remedy the deficiencies, but it quickly became obvious that Nordholm was not going to be able to provide Plaintiff with the assurances it needed. *Id.* On April 30, 2024, when the contract with Nordholm reached an impasse through no fault of Plaintiff, Plaintiff immediately notified ITS of this issue and informed ITS that it had begun new Heavy Lift Contractor negotiations with Surf City Steel/PCMC. *Id.* at ¶ 13. In response, ITS willingly offered to move the cranes from berth 236 to berth 235 with the cost to be borne by Plaintiff and Plaintiff agreed. *Id.*

### C. **Defendants Continued Use of the Cranes**

Pursuant to the terms of the parties' Agreement, title and risk of loss passed to Plaintiff by May 1, 2024, when the Contract Price was paid in full. (**Ex. 1**, Section 7.2).  Section 1 of the Crane Purchase and Sale Agreement states: "Once this Agreement is signed by the Parties, Seller shall cease immediately using the Equipment for cargo handling operations or any main functions of the Cranes, using the spare parts among the Equipment, or performing any maintenance." *Id.* at Section 1).  Upon information and belief, ITS has continued to use the cranes for its own cargo handling operations since May 1, 2024. *Guzman Decl.* at ¶ 15. ITS

3

1    has not offered compensation or maintenance plans to Plaintiff. *Id.* Additionally,
2    ITS is improperly continuing to offer the Cranes for sale and has not removed the
3    listing from the APM Terminals website. See Complaint **Ex. 30** and **31**.

4        D. **Notice of Default**

5        On June 6, 2024, ITS sent Plaintiff a Notice of Default alleging that Plaintiff
6    had failed to perform two obligations: (1) commencing work on Defendants
7    facility for the removal of the cranes by April 15, 2024; and (2) furnishing a
8    Performance Bond to ITS. *Guzman Decl.* at ¶ 17. Complaint **Ex. 13**. While the
9    term "commence work" is not a defined term of the Crane Purchase and Sale
10   Agreement and is therefore ambiguous, Plaintiff had performed the following: (1)
11   engaged in negotiations with a Heavy Lift Contractor; (2) purchased removal
12   equipment from Taiwan; and (3) accepted ITS' offer to move the Cranes to another
13   berth. *Id.* at ¶¶ 10, 13, 14. With respect to the Performance Bond, Plaintiff
14   repeatedly emailed ITS on May 9, May 15, and May 22, 2024 seeking ITS'
15   approval of the Bond language. *Id.* at ¶ 16. Complaint **Ex. 15**. ITS did not approve
16   or even offer comment as to the bond language proposed by Plaintiff. *Id.* ITS'
17   approval of the bond language is required by the Crane Purchase and Sale
18   Agreement and is a condition precedent to the issuance of the performance bond.
19   **Ex. 1**, Section 8.13.

20       On June 7, 2024, the very day after the Notice of Default was issued,
21   Plaintiff responded in good faith outlining the aforementioned steps it had taken to
22   satisfy its obligations under the Agreement. *Guzman Decl. at* ¶ 18. Complaint **Ex.**
23   **14.** Specifically, Plaintiff reminded ITS of the numerous efforts made to obtain
24   ITS' approval of the bond language as well as the contract with Nordholm, the
25   subsequent impasse regarding the contract with Nordholm, Plaintiff's efforts to
26   secure a new alternate contractor, and the parties' agreement regarding relocation
27   of the cranes to another berth to address any potential issues with the cranes
28   remaining on ITS' property. *Id.* On June 13, 2024, Plaintiff received an additional

4

letter from ITS stating Plaintiff had further failed to obtain insurance and provide proof to ITS. *Id.* On June 16, 2024, Plaintiff invited ITS to resolve the alleged issues perceived by ITS. *Id.* at ¶ 19. ITS did not respond to Plaintiff's requests. *Id.* On June 18, 2024, Plaintiff's Chilean bank issued the Performance Bond to ITS' bank, Bank of America. *Id.* at ¶ 16.

**E. Notice of Termination and Proposed Settlement Agreement**

On June 17, 2024, after ignoring Plaintiff's attempts to cure and communicate in good faith, ITS issued a unilateral Notice of Termination to Plaintiff via email. *Id.* at ¶17. Complaint **Ex. 19.** The Notice of Termination informed Plaintiff that it was in default of various provisions of the Crane Purchase and Sale Agreement which it had failed to cure and that the Agreement was therefore terminated. *Id.* The Termination Notice stated ITS was entitled, under the Agreement, to retain both the cranes and the full $500,000.00 Contract Price paid by Plaintiff. *Id.* However, ITS offered to return the $500,000.00 Contract Price *if and only if*, Plaintiff agreed to: (1) waive any challenge to the default and termination; and (2) sign a full, complete, and binding settlement agreement and general release that includes confidentiality and non-disparagement clauses ("General Release"). *Id.* The notice was issued on July 17th and Plaintiff was only given four days, until July 21st, to sign the termination letter and waiver which purports to waive Plaintiff's rights to raise any challenge to the wrongful default and termination. *Id.* at ¶ 23.

The Notice of Termination instilled panic and fear in Plaintiff. *Id.* at ¶ 21. ITS unilaterally claimed Plaintiff had lost the contract, forfeited the full contract price of $500,000.00, and lost any and all rights get its money back or proceed with the purchase of the cranes. *Id.* at ¶ 20. The Notice of Termination imposed psychological and economic hardship and worry to force Plaintiff to sign the purported waiver of rights under duress to at least keep its $500,000.00. *Id.* at ¶ 21. ITS did not allow any additional time to negotiate, discuss, or understand what had happened. *Id.* at ¶ 20. Plaintiff tried to discuss the matter with ITS but was told that

the contract between the parties was terminated and negotiations of new terms were required for the purchase of the Cranes. *Id.* at ¶ 22. ITS additionally led Plaintiff to believe that the only way to reopen negotiations, and to get its $500,000.00 back, was to sign the termination letter and waiver language. *Id.*

Based on ITS' improper conduct in sending the termination letter and accompanying false threats which caused Plaintiff fear of economic hardship, not only to lose the $500,000.00 Contract Price ITS already possessed, but also the loss of the contract with Dole in Ecuador valued in excess of $38M USD, Plaintiff signed the Notice of Termination under the impression that negotiations of terms of a new agreement would begin between the parties. *Id.* at ¶ 22. In its letter, dated June 20, 2024, Plaintiff stated, "while we find ourselves in a situation where we ***have no choice*** but to accept the contract termination demanded, we must insist that this scenario is calamitous for the future of our company. Therefore, if it is feasible or viable for you to initiate a new negotiation through a new contract, establishing new sales terms, substantially incrementing the price, and involving the contractor of your choice, we reiterate our keen interest in proceeding it as soon as possible." Complaint **Ex. 20**. Plaintiff truly believed it had no choice.

Only after the termination letter was signed did ITS present Plaintiff with its proposed Settlement Agreement. Guzman Decl. at ¶ 23. Upon review, Plaintiff realized ITS had no intentions of reopening negotiations, but was unilaterally and wholly terminating the agreement such that it would not be required to sell the Cranes to Plaintiff, whether justified legally or not. *Id.* Plaintiff immediately objected to the Settlement Agreement on the grounds that it misrepresented facts and dates. *Id.* To this date, no Settlement Agreement has been signed. *Id.*

## III.   LEGAL STANDARD

The legal standard for obtaining a temporary restraining order and/or a preliminary injunction are the same. Rule 65 of the Federal Rules of Civil Procedure governs the issuances of injunctions and restraining orders. The purpose

of a temporary restraining order is to "preserv[e] the status quo and prevent[] irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bhd. Of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). Any temporary restraining order, therefore, is a temporary measure to protect rights until a hearing can be held.

A preliminary injunction or a temporary restraining order is warranted when the movant demonstrates four factors: (A) the movant's likelihood of success on the merits, (B) whether the movant will face irreparable harm in the absence of preliminary relief, (C) whether the balance of equities favors preliminary relief, and (D) whether injunctive relief is in the public interest. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). "The Ninth Circuit has adopted an alternative sliding scale approach, in which the elements are balanced, 'so that a stronger showing of one element may offset a weaker showing of another.'" *Biomedical Device Consultants v. Vivitro Labs, Inc.*, 689 F. Supp. 3d 749 (citing *All. of the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011)). Significant questions about the merits and hardship that tips the balance strongly in favor of the plaintiff can justify granting an injunction, provided the other two elements of the *Winter* test are also met. *All. of the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

## IV.   LEGAL ARGUMENT

### A.   Movant's Likelihood of Success

There is a substantial likelihood that Plaintiff will prevail on the merits because ITS improperly terminated the Crane Purchase and Sale Agreement. The grounds for the alleged default by Plaintiff warranting termination are invalid.

#### 1.   Performance Bond

The Crane Purchase and Sale Agreement requires Plaintiff to procure a performance bond. However, ITS is required to approve the bond language and form. Cal Civ Code § 1439 provides that "before any party to an obligation can

7

require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself." Further, § 1440 states that if a party to an obligation gives notice to another, before the latter is in default, that he will not perform the same upon his part, and does not retract such notice before the time at which performance upon his part is due, such ***other party is entitled to enforce the obligation without previously performing or offering to perform any conditions upon his part in favor of the former party.*** Therefore, under the California Civil Code, ITS erred in sending Plaintiff a Notice of Default as it relates to procurement of the Performance Bond because ITS did not perform its own obligations by failing to review and approve the Performance Bond "in form and substance" as required by Section 8.13 of the Crane Purchase and Sale Agreement.

2.   <u>Commence Work on ITS' Facility</u>

The Crane Purchase and Sale Agreement requires Plaintiff to "commence work" by April 15, 2024, referenced in an attachment to the Agreement as engaging with a Heavy Lift Contractor for the removal of the Cranes from ITS' property. ITS informed Plaintiff that Nordholm Companies, Inc. ("Nordholm") was the only company capable of handling work of this kind at ITS' facility. On March 21, 2024, Plaintiff executed an engineering contract with Nordholm. On March 27, 2024, Plaintiff made its first payment of $112,000 to Nordholm reflecting approximately 75% of the engineering costs. Thereafter, Nordholm delayed the BIMCO until April 30, 2024. When the BIMCO was received by Plaintiff, it had no choice but to reject it for being wholly incomplete and subjecting Plaintiff to a $6.4M liability with no bond protection. Plaintiff used its best efforts to remedy the deficiencies, but it was clear Plaintiff had to replace Nordholm. Plaintiff immediately notified ITS of this issue and informed ITS that it had begun new Heavy Lift Contractor negotiations with Surf City Steel/PCMC.

It was at this time that ITS offered to relocate the cranes from berth 236 to berth 235 at Plaintiff's cost. Plaintiff accepted ITS' offer to relocate the cranes

from berth 236 to berth 235 to ensure the Cranes would not be in the way of ITS' operations as Plaintiff commenced work on their removal. Only after ITS assured Plaintiff it could move the cranes to a new berth did ITS suddenly issue its Notice of Default stating Plaintiff had failed to "commence work" as provided by the Agreement. An intent to make a particular date, or time, the essence of the contract must be clearly, unequivocally, and unmistakably shown by an express declaration. *Katemis v. Westerlind*, 120 Cal. App. 2d 537 (citing *Miller v. Cox*, 96 Cal. 339 (1892)). Under the Crane Purchase and Sale Agreement, the Plaintiff's only obligation covered by a "time is of the essence" provision is the complete removal of the Cranes from ITS' facility, which is explicitly stated as due by October 31, 2024. There is still ample time for Plaintiff to fully perform this obligation and Plaintiff has every intent to do so.

Even if there were a "time is of the essence" provision for the undefined "commence work" requirement, ITS waived such a requirement when it offered to move the Cranes from berth 236 to berth 235 to get them out of its way such that the impasse between Plaintiff and Nordholm would not bear any impact upon the parties' performance under the Agreement. There is a general contract rule which states that a "time is of the essence" clause "may be waived by the party entitled to performance if he goes on treating the agreement as still binding after default has been made, he cannot afterwards turn around and set up the delay or default as creating a forfeiture." *Carberry v. Trentham*, 143 Cal. App. 2d 83 (1956). Additionally, after a "time is of the essence" provision has been waived, time only becomes essential again where the vendor makes it so by proper notice and demand. *Id.*

Therefore, because there was no breach by Plaintiff for either the failure to issue a Performance Bond or "commence work" by April 15, 2024, ITS improperly issued a Notice of Default and subsequent Notice of Termination. Plaintiff has paid the full Contract Price and retains Title to the Cranes and bears all risk of loss. ITS

**PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

should be enjoined from using, moving, and/or selling the cranes for which Plaintiff has paid in full.

    **B.**   **Irreparable Harm**

        1.   The Cranes are Unique

Wrongful conduct that deprives plaintiff of a unique product or contract right (one for which there is no available substitute) may constitute irreparable injury where damages would be difficult to quantify at trial. *Reuters Ltd. v. United Press Int'l, Inc.* (2nd Cir. 1990) 903 F.2d 904, 908-909 (supplier of foreign news pictures threatened to stop providing those pictures to wire service); see also *Starlight Sugar, Inc. v. Soto* (1st Cir. 1997) 114 F.3d 330, 332 (loss of a unique or fleeting business opportunity can constitute irreparable injury).

The three Mitsui-Paceco manufactured ship to shore cranes (cranes numbers 2502, 2767, and 2768) that Plaintiff purchased from ITS are unique in weight and height, and in capacity and capability, and are exceedingly difficult if not impossible to locate for sale. They are equipped with a seismic isolation system to maintain port functions in the event of an earthquake. These Cranes have a particular "out and back" reach that makes them suitable for Plaintiff's contract with Dole to be performed specifically at the Port of Guayaquil, Ecuador. These particular Cranes can be easily disassembled and reassembled for transport.

        2.   Plaintiff May Not Recover Adequate Money Damages Due to ITS' Assertion of a Limitation of Liability Clause

A court should grant an injunction when pecuniary compensation would not afford adequate relief or where it would be extremely difficult to ascertain the amount of compensation which would afford adequate relief. Injunctive relief is inappropriate where monetary damages are sufficient to compensate the Plaintiffs for any alleged harm. (*Pacific Decision Sciences Corp. v. Superior Court* (2004) 18 Cal.Rptr.3d 104.)

**PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Here, ITS has asserted that even if ITS is fully culpable and liable to Plaintiff, Plaintiff is not entitled to a single penny over the contract price of $500,000.00 due to a one-sided limitation of liability provision ITS inserted into the Agreement. Despite Plaintiff's belief the provision is unenforceable and invalid, the issue has not been adjudicated at this time. ITS argues the limitation of liability provision precludes recovery for any and all consequential damages, punitive and exemplary damages, and even compensatory damages to the extent in excess of the contract price of $500,000.00. Unfortunately, should ITS be permitted to wrongfully terminate the Agreement without just cause and refuse to proceed with the sale of the Cranes for which Plaintiff has already paid the full Contract Price, Plaintiff will be harmed in excess of the purported $500,000.00 cap on damages claimed by ITS. Plaintiff will suffer millions of dollars as damages flowing out of its loss of its contract with Dole alone.

In the event ITS succeeds on its claim that the limitation of liability provision is valid, a TRO is required because monetary damages will be wholly insufficient to compensate Plaintiff. Without these Cranes, Plaintiff will be unable to fulfill the obligations of its contract with Dole at the Port of Guayaquil, Ecuador. That contract is valued at approximately $38M USD and is anticipated to generate around $6M in profits. Under the Crane Purchase and Sale Agreement, ITS asserts it can only be liable for damages up to the Contract Price of $500,000.00. ITS is aware of Plaintiff's contract with Dole as the Dole executives met with ITS at its facility in Long Beach, California to evaluate the Cranes' fitness and condition for the project in Guayaquil, Ecuador. If ITS is able to continue its use, movement, and possible sale to another bona fide purchaser, there is great risk that the Cranes will become unusable for Plaintiff, either through damage or unavailability, and Plaintiff cannot be properly compensated for its loss under the limitation of liability provisions of the contract.

3.    <u>Loss of Business, Injury to Goodwill, Injury to Reputation</u>

A "substantial loss of business and perhaps even bankruptcy" absent preliminary injunctive relief shows "irreparable injury." *Doran v. Salem Inn, Inc*. (1975) 422 US 922, 932; see also *Grand River Enterprise Six Nations, Ltd. v. Pryor* (2nd Cir. 2007) 481 F.3d 60, 67 (loss of current or future market share may constitute irreparable harm); see also *Celsis In Vitro, Inc. v. CellzDirect, Inc*. (2012) 664 F33d 922, 930 (irreparable harm included price erosion and lost business opportunities). Damage to the goodwill of a business may be difficult to calculate and, thus, evidence of such damage could support a finding of irreparable injury. *Herb Reed Enterprises, LLC v. Florida Entertainment Mgmt., Inc*. (9th Cir. 2013) 736 F.3d 1239, 1250; see also *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc*. (9th Cir. 2001) 240 F.3d 832, 841.  Damage to one's reputation may also be an irreparable injury, particularly if compensatory damages would be uncertain or inadequate. *United Healthcare Ins. Co. v. Advance-PCS* (8th Cir. 2002) 316 F.3d 737, 741; see also *Herb Reed Enterprises, LLC v. Florida Entertainment Mgmt., Inc., supra*, 736 F3d at 1250 ("loss of control over business reputation" could be irreparable injury).

Here, in reliance on the Agreement between Plaintiff and ITS for the purchase of the Cranes, Plaintiff entered into a multi-year contract with Dole valued at approximately $38M USD. If a TRO and/or preliminary injunction are not granted, enjoining ITS from using and/or selling the Cranes at issue before Plaintiff's complaint is adjudicated, Plaintiff's business, goodwill, and reputation would all be harmed significantly. Plaintiff should not be forced to earn income off of a potential damages award rather than by performing its trade. The crane rental and operation business is a relatively small niche industry, especially in regards to high-tonnage cranes. Plaintiff has worked hard since 1983 to develop its reputation and goodwill in the industry, becoming the go-to company for this work in several

**PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

countries in the American Continents.  If Plaintiff suddenly could not perform its end of a $38M USD+ contract with Dole, it would be detrimental beyond repair to its reputation and goodwill in the industry and among its clients and competitors.

### C. Balance of Equities

Plaintiff's application merely seeks maintenance of the *status quo*. Plaintiff and ITS lawfully and willingly entered into the Crane Purchase and Sale Agreement with the intent to transfer the Cranes to Plaintiffs in exchange for $500,000.00. Plaintiff has paid the entire Contract Price to ITS, commenced "work," and has assumed title and risk of loss. ITS is not harmed by the prohibition of use, movement, or sale of the Cranes so long as ITS retains the $500,000.00. In fact, the Agreement explicitly provides for various remedies to ITS in the event Plaintiff is delayed in removing the Cranes, including a daily storage charge and the right to terminate if Plaintiff is later than thirty (30) days past October 31, 2024. Section 7.4 of the Crane Purchase and Sale Agreement states that for each day Buyer failed to complete Buyer's Work by the Guarantee Completion Date, Buyer was to pay to Seller the amount of Five Hundred Dollars ($500) per day as a storage cost of the Equipment and Buyer's occupancy of Seller's Facility (the "Storage Costs").

ITS clearly anticipated a possible delay and inserted language providing it with specific remedies in such an event. Given ITS has appropriate remedies in the event Plaintiff is delayed in removing the Cranes from ITS' property, which has not yet occurred since October 31, 2024 is still months away, maintaining the status quo is equitable and fair. To immediately resort to an outright termination of the Agreement with a severe penalty amounting to a complete forfeiture of the entire contract price of $500,000.00, not to mention all other associated costs including the $80k commission paid to the Facilitator and the $112k non-refundable deposit paid to Nordholm, while getting absolutely nothing in return but

**PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

severe economic losses in the millions is an extreme, unjust, unjustified, and unethical result.

Plaintiff has commenced work to remove the cranes, including acquiring an alternate Heavy Lift Contractor and paying approximately $2.4M USD for equipment being shipped right now from Taiwan to move the Cranes. Plaintiff should be permitted to continue performance under the Agreement and ITS should be required to refrain from bad faith conduct depriving Plaintiff of the right to the benefits of the bargain for which it has already paid in full.

**D.    Public Interest**

Preserving the *status quo* and enjoining Defendants from using, moving, or selling the Cranes until the Complaint is determined exemplifies relief that is in the public interest. Dole is the world's largest producer of fruits and vegetables. Dole exports over 20,000 shipments from Ecuador each year. The produce grown in Ecuador is sold in the United States, Europe, Asia, and the Middle East. In 2002, Dole invested in the Port of Guayaquil by spending $28M to build a new port. This port has been the key to the economic boom experienced in Ecuador in recent years. The Dole foundation continued to invest in Ecuador by building 21 health centers and two schools. Dole's continued operations at the Port of Guayaquil are essential not only to the global economy, but to the people of Ecuador.

Additionally, it is in the public interest that when a contract for the sale of goods is negotiated and signed by both parties in good faith, that the rights and obligations of both parties are enforced and protected.  Where a doubt exists as to a party's default, a temporary restraining order is the only remedy that adequately protects the parties' interests until a determination is made by the court.

**E.    No Bond Should be Required**

A bond is not required in all cases where temporary injunction is issued. Here, ITS has received and is in possession of the full Contract Price for the

**PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

Cranes at issue in the sum of $500,000.00.  While ITS claims it has the right to retain the full Contract Price despite unilaterally terminating the agreement, this would equate to an unenforceable penalty, forfeiture, and/or liquidated damages provision arbitrarily causing Plaintiff to lose 100% of its consideration paid for the purchase of the Cranes of which ITS is now wholly depriving Plaintiff. There is no risk of harm to ITS arising out of this TRO and OSC while it retains the full Contract Price value of $500,000.00.  Even if the Court was inclined to require a bond as security, ITS already holds $500,000.00 as security where it should either return the $500,000.00 in full immediately upon its wrongful termination (rather than threaten and intimidate Plaintiff into signing a waiver of rights under psychological and economic Duress) or acknowledge it has received full payment and hold up its end of the bargain.

## V.    CONCLUSION

For the Reasons set forth above, Plaintiff respectfully requests that this Court issue a temporary restraining order enjoining Defendants from using, moving, or selling the Cranes and an order to show cause why a preliminary injunction should not be issued.

Dated: July 17, 2024                **GOLSHANI LEE LLP**

By:    */s/ Shervin Golshani*
Shervin Golshani, Esq.
Christopher J. Lee, Esq.
Attorneys for Plaintiff
TECNOGRUAS


Dated: July 17, 2024                **ZECCA ROSS LAW FIRM P.C.**

By:    */s/Leticia Zecca Ross*
Leticia Zecca Ross, Esq.
Attorneys for Plaintiff,
TECNOGRUAS