Shervin Golshani, Esq. (SBN 297320)
Christopher J. Lee (SBN 330298)
**GOLSHANI LEE LLP**
10680 Treena Street, Suite 100
Phone (858) 360-6454
golshani@golshanilee.com
lee@golshanilee.com

Leticia Zecca Ross, Esq. (SBN 344344)
**ZECCA ROSS LAW FIRM P.C.**
7668 El Camino Real, 104-444,
Carlsbad, CA 92009
Phone (619) 782-0186
leticia@zeccarosslaw.com

Attorneys for Plaintiff, TECNOGRUAS

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TECNOGRUAS, a corporation registered in Chile;<br><br>        Plaintiff,<br><br>v.<br><br>INTERNATIONAL TRANSPORTATION SERVICE LLC, a Delaware limited liability company; and DOES 1 to 10, inclusive;<br><br>        Defendants. | Case No.: 2:24-cv-05984<br><br>**DECLARATION OF ALEJANDRO GUZMAN IN SUPPORT OF PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>[Ex Parte Application; Declaration of Golshani; and [Proposed] Order Filed Concurrently Herewith] |

I, Alejandro Guzman, declare as follows:

1.      I am an individual over eighteen years of age and I submit this declaration in support of Plaintiff TECNOGRUAS' Ex Parte Application for Temporary Restraining Order, Expedited Discover and Order to Show Cause Re Preliminary Injunction. I have personal knowledge of the facts set forth in this declaration and if called upon to testify thereto, I would and could do so both competently and truthfully.

2.      I am the owner of Tecnogruas, a corporation in the crane rental and operation business formed in 1983 and existing under the laws of Chile, with its principal place of business and headquarters in Av Santa Maria 2670 Of. 505. Torre B, Providencia, Santiago, Chile.

3.      Tecnogruas was founded to serve a niche industry of heavy lifting machinery specializing in high-tonnage cranes for its international clients.

4.      In the last 40 years, Tecnogruas has become an industry leader and the go-to company due to its hard-earned reputation and goodwill.

**Description of the Crane Purchase and Sale Agreement**

5.      As a growing company, Tecnogruas sought to purchase ship-to-shore cranes to add to its fleet in order to take on additional work with Naportec S.A., otherwise and hereinafter known as Dole.

6.      Dole executives traveled to the port in Long Beach, California in October of 2022 to meet with Tecnogruas and ITS to assess the Cranes condition and fitness for the project in Guayaquil, Ecuador.

7.      On March 7, 2024, Tecnogruas and ITS entered into the Crane Purchase and Sale Agreement whereby ITS agreed to sell and transfer the title of three Mitsui-Paceco manufactured ship to shore cranes, cranes numbers 2502, 2767, and 2768 (the "Cranes"), together with certain spreaders, spare spreader, manuals and drawings (collectively, with the Cranes, the "Equipment") to Plaintiff

in exchange for the sum of Five Hundred Thousand United States Dollars ($500,000.00) (the "Contract Price"). Attached herewith as **Exhibit 1** is a true and correct copy of the Crane Purchase Agreement.

8.      Only after signing the Crane Purchase and Sale Agreement with ITS did Tecnogruas execute its contract with Dole. The contract with Dole was signed on March 13, 2024. Attached herewith as **Exhibit 2** is a true and correct copy of the Dole contract.

9.      On April 29, 2024, Tecnogruas wired $580,000 to Pacific Handling Systems. Pacific Handling Systems was the facilitator that found and negotiated the sale of the Cranes from ITS to Tecnogruas. Pacific Handling Systems then wired $500,000 to ITS to satisfy the full contract price. The additional $80,000 was retained by Pacific Handling Systems as compensation for its services as facilitator in the form of a commission.

**Fulfilling Obligations Under the Crane Purchase and Sale Agreement**

10.      Tecnogruas engaged in negotiations with Nordholm Companies, Inc. ("Nordholm") to provide Heavy Lift Contractor services in removing the Cranes from the Port of Long Beach, California to Guayaquil, Ecuador. ITS had previously informed Tecnogruas that Nordholm was the only company that was capable of handling the work of removing the Cranes from ITS's facility.

11.      On March 27, 2024, before the Crane Purchase and Sale Agreement was even signed by ITS, Plaintiff wired a deposit of $112,000 to Nordholm as a deposit towards the engineering work relating to removal of the Cranes.

12.      Nordholm delayed the BIMCO until April 30, 2024 and when it was provided to Tecnogruas it did not identify a shipping vessel and did not include any bond to protect Tecnogruas' $6.4M exposure. Tecnogruas sought to have the deficiencies remedied by Nordholm, but Nordholm refused.

13.     Tecnogruas immediately notified ITS of the issues. On May 1, 2024, in response to Tecnogruas' notification, Halfdan Ross of ITS informed Tecnogruas that ITS would authorize Tecnogruas to move the Cranes from berth 236 to berth 235 while it negotiated with a new Heavy Lift Contractor. On May 24, 2024 Tecnogruas accepted ITS's offer while it continued to negotiate with Surf City Steel/PCMC for the removal of the Cranes. Tecnogruas was to bear the $600,000 cost of moving the Cranes.

14.     On June 4, 2024, Tecnogruas purchased a special system from Taiwan to move the cranes. This system cost approximately $2.4M US dollars. The system has since departed Taiwan. It was currently due to arrive in Long Beach on July 18, 2024, it has been delayed to the week of August 10, 2024.

15.     Tecnogruas assumed title and risk of loss for the Cranes on May 1, 2024 when the Contract Price was paid in full to ITS. Tecnogruas was informed by Facilitator that ITS is continuing to operate the Cranes for its own cargo handling purposes. ITS has not provided with Tecnogruas any compensation or proof of ongoing maintenance for its use of the Cranes.

16.     Because Tecnogruas is a Chilean corporation and all its banking lines are based in Chile, in order to provide ITS with a performance bond, the bond must be transmitted directly from the Chilean bank (Banco de Créditos e Inversiones) to ITS's bank (Bank of America). Tecnogruas had the Chilean bank prepare the language for the bond but would not send the bond to Bank of America without ITS's approval. On May 9, 15, and 22, 2024 Tecnogruas contacted ITS regarding the language for the Performance Bond. ITS did not approve or offer any comments as to changes for the bond language. On June 18, 2024, the Chilean bank issued the Performance Bond to Bank of America.

**DECLARATION OF ALEJANDRO GUZMAN IN SUPPORT OF PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

**Notice of Default and Termination**

17.    On June 6, 2024, Tecnogruas received a Notice of Default from ITS. This was the first communication from ITS that indicated ITS was unhappy with the progress being made by Tecnogruas in its efforts to remove the Cranes from the Port of Long Beach.

18.    On June 7, 2024, Tecnogruas responded to the Notice of Default by addressing the failure of ITS to approve the bond language and Tecnogruas' constant communication with ITS regarding the removal of the Cranes, its failed negotiations with Nordholm, and its subsequent negotiations with Surf City Steel/PCMC. Tecnogruas reminded ITS that ITS had offered, and Tecnogruas had accepted, to move the Cranes to a different berth as the equipment from Taiwan was enroute. On June 13, 2024, Tecnogruas received another letter from ITS informing Tecnogruas that it had failed to provide ITS with proof of insurance.

19.    On June 16, 2024 Tecnogruas attempted to contact ITS to resolve the issues so it could move forward with its performance under the contract. ITS did not respond to any of Tecnogruas' attempts to reach a resolution.

20.    On June 17, 2024, Tecnogruas received a unilateral Notice of Termination via email. The Notice of Termination informed Tecnogruas that it had failed to cure the defaults and that the agreement between the two parties was terminated. The Notice of Termination informed Tecnogruas that, under the contract, ITS was entitled to retain both the $500,000 Contract Price and the three Cranes. The Notice then offered to return the Contract Price if Tecnogruas signed a general release that forfeited its right to waive any challenge to the default and termination and agree to sign a full, complete, and binding settlement agreement and general release that includes confidentiality and non-disparagement clauses. Plaintiff only had until July 21, 2024 to sign the general release.

**DECLARATION OF ALEJANDRO GUZMAN IN SUPPORT OF PLAINTIFF TECNOGRUAS' EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

21.    The thought of losing not only the Cranes but also the $500,000 caused Tecnogruas to panic and try to mitigate its losses.

22.    Tecnogruas was under the impression that if it signed the general release, it would be able to renegotiate the contract with ITS. Tecnogruas was under this impression because ITS informed Tecnogruas that new terms would be required for it to purchase the Cranes. ITS led Tecnogruas to believe that if it signed the general release then it would reopen negotiations for the sale of the Cranes. Tecnogruas did not see any options other than signing the general release.

23.    After Tecnogruas signed the general release, ITS presented it with the proposed settlement agreement. In reviewing this, Tecnogruas realized that ITS never had any intention of renegotiating for the sale of the Cranes. Tecnogruas immediately objected to the proposed settlement agreement because it misrepresented the facts and dates. Tecnogruas has not signed any settlement agreement with ITS.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed this 17th day of July, 2024 at Santiago de Chile, Chile.

_____
Alejandro Guzman

5

EXHIBIT 1

## CRANE PURCHASE AND SALE AGREEMENT

This CRANE PURCHASE AND SALE AGREEMENT (this "**Agreement**") is made and entered into effective as of this 7th day of March, 2024 ("**Effective Date**"), by and between International Transportations Service, LLC, a Delaware limited liability company with a principal place of business at 1281 Pier G E Long Beach, California 90802 ("**Seller),** Tecnogruas, corporation registered in Chile with a principal place of business at Av. Santa Maria 2670 Of. 505, Torre B, Providencia, Santiago, Chile ("**Buyer")** and for the limited purpose of Sections 2.2 and 2.3, Pacific Handling Systems, Inc.( "**Facilitator**"). Seller and Buyer may be referred herein individually as "**Party**" or collectively as "**Parties**."

### RECITALS

WHEREAS, Seller owns three Mitsui-Paceco manufactured ship to shore cranes, crane numbers 2502, 2767, 2768 (the "**Cranes**"), together with certain spreaders, spare spreader, manuals and drawings listed in Attachment A hereto (collectively, with the Cranes, the "**Equipment**") currently located at Seller's facility in Long Beach, California ("**Seller's Facility**"); and

WHEREAS, Buyer desires to purchase the Equipment from Seller, and Seller desires to sell the Equipment to Buyer, on the terms and conditions hereinafter set forth; and

WHEREAS, Buyer will engage the services of a contractor and/or subcontractors to enter the Seller's Facility, dismantle the Equipment, remove the Equipment from its current location, load unto a vessel for export, transport it to Buyer's terminal in Guayaquil, Ecuador, and install it at Buyer's terminal.

NOW, THEREFORE, for and in consideration of the foregoing and of the mutual agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller, and Buyer hereby agree as follows:

1.  Sale and Transfer of Title of the Equipment. According to the terms and conditions stated herein and as provided in Section 7 of this Agreement, Seller shall grant, transfer, sell and convey to Buyer good and marketable title to the Equipment, free and clear of all liens and encumbrances arising from Seller, and Buyer will purchase, receive and accept title to the Equipment at Seller's Facility. Buyer shall be responsible for, and paying all costs of, all work for the proper, workmanlike and orderly removal of the Equipment from Seller's Facility, including the design, dismantling, transporting from the crane rails to the vessel, loading and shipment of the Equipment, and the removal of all Buyer's equipment, materials and debris and repair and clean-up of Buyer's work and storage area ("**Buyer's Work")**, to Seller's reasonable satisfaction. Buyer agrees and acknowledges that the list of spare parts on Attachment A is an approximation of the spare parts in inventory. Seller shall have no liability to Buyer in the event the actual inventory of spare parts, whether by item or number of items, delivered to Buyer is less than the spare parts shown on Attachment A. In addition, Seller shall have no liability whatsoever to Buyer or any third

1

party in connection with or relating to the Equipment, including, but not limited to, its future relocation, use or operation thereof. Once this Agreement is signed by the Parties, Seller shall cease immediately using the Equipment for cargo handling operations or any main functions of the Cranes, using the spare parts among the Equipment, or performing any maintenance[1]. Seller will keep at all times the Cranes connected to the power supply.

The Parties shall reasonably cooperate in all matters concerning this Agreement and, to the extent such cooperation requires that Seller incur any out of pocket cost or expense, such cooperation by Seller shall be at Buyer's cost and expense.

2.    Payment.

2.1    In consideration of the sale, purchase, and transfer of title of the Equipment as provided herein, Buyer agrees to pay Seller the sum of Five Hundred Thousand United States Dollars ($500,000) (hereinafter, the "**Contract Price**") within 30 business days following the Effective Date. As further set forth in Section 6, the Contract Price is exclusive of any applicable federal, state or local taxes or any other charges and fees related to the Equipment or the sale thereof, which shall be paid by Buyer. The Parties acknowledge that, as of the Effective Date, the Facilitator (as defined below) on behalf of Buyer has paid to Seller the nonrefundable sum of forty-five thousand dollars ($45,000) toward the Contract Price, and that the remaining unpaid balance of the Contract Price is Four Hundred Fifty-Five Thousand United States Dollars ($455,000).

2.2    Buyer engaged the services of Pacific Handling Systems, Inc. ("**Facilitator**"), an Oregon corporation with its principal place of business at 21370 S.W. Langer Farm Parkway, Suite 142, Sherwood, Oregon 97140, to find the Equipment and to assist in negotiation of its purchase by Buyer and sale by Seller ("**Services**"). For its Services, Buyer owes Facilitator the sum of Two Hundred and Twenty-Five Thousand United States Dollars ($225,000) ("**Facilitator Fees**"). Buyer and the Facilitator acknowledge that, as of the Effective Date, Buyer has paid to Facilitator, and Facilitator has received, the nonrefundable sum of One Hundred Thousand United States Dollars ($100,000) and that the remaining balance of the Facilitator Fees is One Hundred and Twenty-Five Thousand United States Dollars ($125,000) ("**Facilitator Fees Balance**") Buyer shall pay the Facilitator Fees Balance to Facilitator simultaneously with payment to Seller. Buyer shall request that the insurance certificate add and include Facilitator as additional insured or party in interest to the extent that the insurer is willing to do so. THE OBLIGATION BETWEEN BUYER AND FACILITATOR AND THE PAYMENT OF THE FACILITATOR FEES BALANCE ARE MATTERS EXCLUSIVELY BETWEEN BUYER AND FACILITATOR AND DOES NOT CONCERN, AND DOES NOT IMPACT IN ANY WAY, SELLER NOR THE OBLIGATIONS AND DUTIES BETWEEN SELLER AND BUYER UNDER THIS AGREEMENT. THIS SECTION 2.2 IS INSERTED AS A MATTER OF CONVENIENCE BETWEEN

BUYER AND FACILITATOR TO DOCUMENT THEIR INDEPENDENT OBLIGATIONS BETWEEN THEMSELVES AND NONE OTHER. NEITHER BUYER NOR FACILITATOR SHALL MAKE, AND EACH OF BUYER AND FACILITATOR HEREBY WAIVE CONCLUSIVELY, ANY AND ALL CLAIMS, DEMANDS, EXCUSE OF PERFORMANCE, OR OTHERWISE AGAINST SELLER UNDER THIS AGREEMENT IN ANY WAY RELATING TO THIS SECTION 2.2.[2]

2.3    Payments to Seller and Facilitator shall be made by wire transfer in immediately available funds. Seller and Facilitator must provide the contact and phone number that will be responsible for confirming by phone, upon call from Buyer, to confirm the wire transfer instructions sent by fax or email. As to Seller, the contact person is Halfdan Ross at phone 562.590.6764. As to Facilitator, the contact person is Mike Condon at phone 503.799.4664.

3.    Insurance.

3.1    As a condition to this Agreement and without limiting any Buyer indemnity obligations hereunder, Buyer shall procure and maintain either directly or through its contractors, subcontractors, and suppliers at their respective expense the insurance described in Attachment B hereto covering all risks associated with the ownership of the Equipment, Buyer's Work at Seller's Facility, transfer of the Equipment and operation of the Equipment after removal from Seller's Facility and the obligations of Buyer under this Agreement ("**Evidence of Insurance**").[3] Such insurance shall be in effect no later than three (3) business days following the Effective Date and for so long as the later date of either (a) any such parties are on Seller's Facility or (b) as otherwise provided in Attachment B. Buyer shall deliver to Seller certificates of insurance evidencing the required insurance within three (3) business days following the Effective Date.

3.2    Each insurer underwriting any of the policies required hereunder shall be authorized to conduct business in the State of California and, with the exception of Workers' Compensation coverage, all required insurance is to be placed with insurers with a current A.M. Best's rating of not less than A:VII or equivalent.

4.    Representations and Warranties of Seller.

4.1    Seller represents and warrants that:

4.1.1    Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware, and has all requisite

3

power and authority to execute, deliver and perform this Agreement.

4.1.2    The execution, delivery and performance of this Agreement by Seller and the consummation of the transactions contemplated herein have been duly authorized and approved by all necessary limited liability company action.

4.1.3    Seller is not in default, bankruptcy, insolvency, reorganization or in breach of contract with regard to any contracts referenced in this Agreement, and there are no causes of action, suits, claims or proceedings pending or threatened against Seller related to any contracts or agreements referenced herein.

5.    Representations and Warranties of Buyer and Ultimate Buyer.

5.1    Buyer represents and warrants that:

5.1.1    Buyer is a corporation, duly organized, validly existing and in good standing under the laws of Chile, and has all requisite power and authority to execute, deliver and perform this Agreement.

5.1.2    The execution, delivery and performance of this Agreement by Buyer and the consummation of the transactions contemplated herein have been duly authorized and approved by all necessary corporate action.

5.1.3    Buyer is not in default, bankruptcy, insolvency, reorganization or in breach of contract with regard to any contracts referenced in this Agreement, and there are no causes of action, suits, claims or proceedings pending or threatened against Buyer related to any contracts or agreements referenced herein.

5.1.4    Buyer is not, and its directors, officers and employees are not, and to Buyer's knowledge following due inquiry, and its directors, officers and employees are not, a Designated Person (as defined below) or otherwise the target or subject of any Sanctions (as defined below). For purposes of this Section 5.1.4. "**Designated Person**" means a person (a) named on, or owned or controlled (as such terms, including any applicable ownership and control requirements, are defined and construed in the applicable Sanctions or in any official guidance in relation to such Sanctions) by a person listed on. the List of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Asset Control as administered by the United States Department of Treasury, or any similar list of Sanctions targets maintained by the United Nations Security Counter, the European Union, or the United Kingdom or (b) located, organized or residing in a country or territory that is the subject of comprehensive Sanctions, as of the date hereof the so called Donetsk People's Republic, the so-called Luhansk People's Republic, Cuba, Iran, North Korea, Syria, and the Crimea region

4

of Ukraine. "**Sanctions**" means economic sanctions or trade restrictions administered or enforced from time to time by (a) the U.S. government, including without limitation, those administered by the Office of Foreign Assets Control administered by the United States Department of the Treasury or the U.S. Department of State or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

5.1.5    Buyer, and to Buyer's knowledge following actual due inquiry is in compliance with all Sanctions and governmental laws, rules and regulations relating to terrorism and money laundering.

5.1.5    Buyer, and to Buyer's knowledge any of its directors, officers and employees, and to Buyer's knowledge following due inquiry, and its directors, officers and employees, has not taken any action that would result in a violation by any such person of the Foreign Corrupt Practices Act of 1977 ("**FCPA**"), including, without limitation, making any offer, payment, promise to pay or authorization or approval of the payment of any money, or other property, gift, promise to give or authorization of the giving of anything of value, directly or indirectly, to any "**Foreign Official**" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in each case in material contravention of the FCPA.

6.    Taxes and Other Charges.  Except for taxes assessed against Seller that are measured by net income or profit of Seller, Buyer shall pay or cause to be paid all federal, state, local or non-U.S. taxes, levies, fees, assessments or charges of any kind whatsoever (including, without limitation, all duties, sales, use, ad valorem, value added, transfer, franchise, labor, social security, license, excise, registration, business, stamp or property taxes, levies, fees, assessments or charges)imposed by any Applicable Law or any government authority on or with respect to the sale of the Equipment, Buyer's Work at Seller's Facility, transfer of the Equipment and operation of the Equipment after removal from Seller's Facility, export of such Equipment from the United States of America, import of such Equipment to any jurisdiction and any other obligations of Buyer under this Agreement, together with any interest, penalty, addition to tax or additional amount imposed by any Applicable Law or governmental authority, whether disputed or not (collectively, "**Taxes**").  If Seller is required to remit or pay Taxes that are the responsibility of Buyer, Buyer shall promptly reimburse Seller for any such Taxes. If Buyer is entitled to an exemption from such Taxes, Buyer shall furnish Seller with a valid exemption certificate and Buyer shall be solely responsible for all costs and expenses associated with asserting, establishing and obtaining recognition of such exemption from Taxes.  All other charges relating to the sale, dismantling, removal, loading, transport, export and import of the Equipment are for the account of, and shall be the sole and exclusive responsibility of, Buyer including, but not limited to, wharfage and dockage, port charges, customs, export/import clearance and labor/stevedoring charges. [Buyer shall not be responsible for storage or terminal charges

applicable to the area in which the dismantling of the Equipment will take place except as otherwise provided in Section 7.4 of this Agreement.][4]

7.    "As Is" Transfer, Risk of Loss and Storage Costs.

7.1    BUYER ACKNOWLEDGES AND AGREES THAT IT HAS INSPECTED THE EQUIPMENT AS OF THE DATE OF THIS AGREEMENT AND ACCEPTS THE EQUIPMENT IN ITS ENTIRETY "AS IS" AND "WHERE IS" IN ITS CONDITION WITH ANY AND ALL FAULTS OR DEFECTS, AND WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND FROM SELLER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY WARRANTY AS TO SUITABILITY, MERCHANTABILITY, CONDITION, QUALITY OR FITNESS, OR FITNESS FOR A PARTICULAR PURPOSE. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT SELLER IS NOT THE ORIGINAL EQUIPMENT MANUFACTURER AND MAKES NO REPRESENTATION OR WARRANTY AS TO THE AVAILABILITY OF MANUFACTURER SERVICES, SPARE PARTS OR OTHERWISE WITH RESPECT TO THE EQUIPMENT.

7.2    Title to the Equipment shall pass to Buyer upon payment in full of the Contract Price[5]. Risk of loss, damage and injury in respect of the Equipment shall immediately pass to Buyer as of the Effective Date. Upon removal of the Equipment by Buyer from Seller's Facility, Seller shall deliver to Buyer the Bill of Sale substantially in the form set forth in Attachment C. Notwithstanding the foregoing, if this Agreement terminates for any reason whatsoever prior to the removal of the Equipment by Buyer from Seller's Facility, title to the Equipment shall automatically revert to Seller, with no further action required by Seller or Buyer, and Seller shall be entitled to dispose of the Equipment in any manner it sees fit.

7.3    Time is of the essence for Buyer to remove the Equipment from Seller's Facility.

7.4    Buyer shall commence work on Seller's Facility for the removal of the Equipment no later than April 15, 2024 ("**Work Date**"). Buyer shall complete Buyer's Work no later than October 31, 2024, unless extended by reason of an applicable Force Majeure Event ("**Guaranteed Completion Date**"). For each day Buyer fails to complete Buyer's Work by the Guaranteed Completion Date, Buyer shall pay to Seller the amount of Five Hundred Dollars ($500) per day as a storage cost[6] of the Equipment and Buyer's occupancy of Seller's Facility (the "Storage Costs"). Such storage costs are for Buyer's delay in achieving the Guaranteed Completion Date and not in lieu of any other rights or remedies of Seller, whether in this Agreement or at law or in equity. Any fees due and owing from Buyer to Seller will be treated as demurrage and such payment of fees must be paid by Buyer in order for the

Equipment to be released from Seller's Facility. Seller shall be permitted to invoice Buyer periodically for Storage Costs and Buyer's failure to pay any such invoice within ten (10) days after receipt shall be a default by Buyer under Section 10 of this Agreement. Buyer may request from Seller, and which Seller shall have sole discretion to grant or not grant, an extension of time to the Work Date or the Guaranteed Completion Date in the event of a Force Majeure Event (as defined in Section 14 herein) that prohibits Buyer's or the Third-Party Provider's activities at Seller's Facility which directly impacts Buyer's Work. If Buyer does not complete Buyer's Work within thirty-one (31) days after the Guaranteed Completion Date, then Seller may terminate this Agreement by written notice to Buyer and retain the Contract Price, the Equipment and collect and retain all Storage Costs incurred.

7.5    Attached hereto as Attachment D is a schedule, detailing the Buyer's expected operations, including calculations, shop drawings, approvals and the sequence of Buyer's Work. For the avoidance of doubt, no update to such schedule will change the Work Date or Guaranteed Completion Date.

7.6    NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, SELLER SHALL HAVE NO LIABILITY UNDER ANY PROVISION OF THIS AGREEMENT FOR ANY PUNITIVE, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES, INCLUDING DIMINUTION IN VALUE, BUSINESS INTERRUPTION, LOSS OF FUTURE REVENUE, PROFITS OR INCOME, OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY UNDER THIS AGREEMENT OR RELATING TO THE BREACH OR ALLEGED BREACH OF THIS AGREEMENT.

7.7    NOTWITHSTANDING ANY PROVISION IN THIS AGREEMENT TO THE CONTRARY, SELLER'S AGGREGATE LIABILITY TO BUYER FOR ALL LOSSES, DAMAGES, EXPENSES, CLAIMS, DEMANDS, CAUSES OF ACTION OR OTHERWISE IN CONNECTION WITH THIS AGREEMENT SHALL IN NO EVENT WHATSOEVER EXCEED THE AMOUNT OF THE CONTRACT PRICE ACTUALLY RECEIVED BY SELLER.

8.    Covenants of Buyer.

8.1    Buyer shall be responsible for all Buyer's Work involved in removing the Equipment from Seller's Facility, including but not limited to, design, any dismantling, transport from the crane rails to the vessel, loading and shipment of the Equipment from Seller's Facility. Buyer shall be responsible to submit the written plans and drawings for approval by the U.S. Coast Guard of transit of the vessel carrying the Equipment within the boundaries of the Port of Long Beach. Without limiting any other provision hereof, it is understood by the parties hereto that the Harbor Development Permit and other necessary permits if any (the "Permit" or collectively "Permits") enabling the Buyer to use the water areas at and adjacent to the Seller's terminal and to load the Equipment in connection with Buyer's Work is required to be obtained from the Port of Long Beach by the Buyer at its sole cost.

7

8.2    Simultaneously with the execution of this Agreement, Buyer will contract the services of a removal contractor ("**Third Party Provider**") to handle the removal of the Equipment and loading unto vessel for transport to Ecuador to the terminal of Buyer and Buyer shall promptly confirm in writing to Seller that it has engaged the Third-Party Provider to perform such services. For purposes of this Agreement, the Third-Party Provider shall be considered a contractor of Buyer.   Prior to commencing the removal work, Buyer and its Third-Party Provider shall provide to Seller and to Port Long Beach the plans for any dismantling, transport to the vessel, and loading the Equipment.  The plans shall include all information and meet all conditions set forth in Sections 8.3 through 8.8 of this Agreement.  Buyer and the Third-Party Provider shall not commence removal work until approval in writing therefor from Port Long Beach and Seller are issued. Neither Seller nor Port of Long Beach shall have any liability in connection with such approval.  Buyer shall be responsible for any and all fees and/or costs of obtaining said approval from Port of Long Beach.

8.3    Buyer and its Third-Party Provider shall provide written notice to Seller, and obtain the written approval of Seller, of the date Buyer would enter upon Seller's Facility to begin to remove the Equipment. Buyer shall provide at least fourteen (14) days written notice to Seller and Port Long Beach, and obtain the written approval of Port Long Beach, of the date the vessel to transport the Equipment would arrive at Seller's Facility.  Port of Long Beach shall assign Buyer the berth(s) for the vessel based upon the approved arrival date.

8.4    Buyer shall obtain all necessary information as to the working conditions, and site data, at the Seller's Facility and satisfy itself that it will have available all resources and materials as shall be necessary to perform Buyer's Work as contemplated herein. As soon as possible, Buyer shall present to Seller and (to the extent applicable) to Port Long Beach for its review and approval a proposed site organization plan, which shall specify, in progressive stages, the working and storage areas Buyer requires for Buyer's Work.

8.5    Buyer has examined the Seller's Facility and shall be deemed to have (a) considered the need to ensure that Buyer's Work will not interfere with the port operations, except in respect of areas specifically allocated to it nor with the work of other contractors or workmen employed by the Seller at the Seller's Facility, (b) obtained all necessary information as to the conditions of working at the Seller's Facility, and elsewhere and to have obtained all necessary information on all matters and things that may in any way influence it in completing the work and to have satisfied itself as to the risks (including political and country risks), obligations and responsibilities to be undertaken in entering into this Agreement, (c) inquired into and satisfied itself as to the sources of supply, the sufficiency of and the means of obtaining and transporting all Equipment, materials, labor, fuel, water, electricity and other things required for, or in connection with, Buyer's Work and to have considered all matters

and possible contingencies affecting the execution and completion of Buyer's Work, (d) satisfied itself that Buyer's Work can be performed as contemplated in the Agreement and (e) satisfied itself as to the following at the Seller's Facility and the vicinity thereof so as to complete Buyer's Work in accordance with the Agreement: (I) the nature of the existing works and buildings, (II) the nature of the existing roads and waterways or other means of communication, (III) entry and egress, (IV) the available accommodation as regards land for temporary purposes (within or without the Seller's Facility) and buildings that may be required for temporary purposes, (V) all potential fixed or variable hindrances to navigation of the Equipment or any portion thereof and its transport vessel(s), and (VI) as to work-yard sites and such other additional areas that it may require for temporary occupation.

8.6     Buyer shall have considered and take all necessary allowances and measures required to ensure that the wharf structure will not be overloaded or damaged by the Equipment or Buyer's Work. Buyer shall be responsible for producing all necessary analyses and calculations sealed by an engineer licensed in the State of California to demonstrate that the wharf structure will not be overloaded or damaged by the loading operations of the Equipment. Buyer shall supply to Seller for review by Port of Long Beach copies of all such calculations. Seller shall make available to the Buyer data and drawings in its possession that are pertinent to the Buyer making the foregoing calculations. Buyer will not be permitted to move or load the Equipment or any portion thereof if such movement or loading would exceed the safe working limit of the wharf or dock. Notwithstanding the above, any review of Buyer's calculations shall not relieve Buyer of its responsibility for ensuring that the wharf structure will not be overloaded or in any way damaged by Buyer's Work and operations set forth herein. Neither Seller nor Port of Long Beach shall have any liability in connection with Buyer's plans or calculations or any review thereof.

8.7     Buyer, and any and all contractors, shall comply at all times with all Applicable Laws. "**Applicable Laws**" shall mean all applicable provisions of federal, state and local laws, statutes, rules, regulations, codes, permits, licenses, official directives and orders having application to this Agreement, the activities contemplated herein and to Seller's Facility. Applicable Laws shall include all requirements of Port of Long Beach, ISPS-code, PCMC safety code and federal and state (including without limitation California) Occupational Health and Safety Administration ("**OSHA**").

8.8     Buyer, and any and all contractors, shall comply at all times with the safety and security requirements pertaining to the Seller's Facility. Buyer shall obtain all required certifications for material handling use by all applicable regulatory authorities having jurisdiction including, without limitation, state and federal OSHA certifications. Buyer shall be responsible to obtain all work and site clearances, permits and licenses in order to perform its obligations under this Agreement. Buyer shall submit to Seller for approval the Health and Safety Plan of Buyer meeting the requirements of Seller and Port of Long Beach, including an emergency response plan and emergency contacts covering all Buyer's activities on Seller's Facility.

9

8.9    Buyer may not assign or transfer the Agreement or any of its rights or obligations under the Agreement, in whole or in part, to any third party without the prior written consent of the Seller, in Seller's sole discretion, and any such attempted assignment or transfer without the prior written consent of the Seller shall be null and void and of no force or effect. Buyer may not subcontract or delegate any of its or their duties under the Agreement to any third party, including, but not limited to, the performance of any Buyer's Work and the supply of materials or equipment, in any such case without the prior written consent of the Seller. Nothing in the Agreement shall create nor will any contractual relationship exist between the Seller and any contractor of or supplier to the Buyer with respect to the Agreement. Seller may, but shall not be required, to interact with any contractor or supplier.

Notwithstanding any provision of the Agreement, the Buyer will be fully responsible to the Seller for all acts, omissions, failures or faults of any contractor, subcontractor, or supplier as fully as if they were the acts, omissions, failures or faults of the Buyer and will require its contractors, subcontractors, and suppliers to provide or perform their portion of Buyer's Work in a manner consistent with the Agreement. If any contractor, subcontractor, or supplier fails to perform any portion of Buyer's Work as required to be performed in accordance with the Agreement, Buyer shall be responsible therefor as if such Buyer's Work were performed by the Buyer, at no cost or expense to the Seller. Buyer's subcontracting of any portion of Buyer's Work in accordance with the terms of the Agreement will not in any way increase the cost, expense or liability of the Seller hereunder. Buyer shall require each approved contractor, subcontractor, and supplier to perform its portion of Buyer's Work (i) under the Buyer's supervision and (ii) in accordance with the applicable requirements of the Agreement. Buyer shall enter into contracts in writing with all contractors, subcontractors, and suppliers and require them to perform or provide their portion of Buyer's Work that protect the Seller's rights and benefits hereunder consistent with the Agreement, and in any event such subcontract and supply agreements shall not conflict with the provisions of the Agreement.

8.10   Buyer shall not permit any lien, encumbrance or claim to be made against Seller, the Equipment, or the Seller's Facility by any contractor of Buyer. Buyer shall be responsible for the payment and removal of any such lien, encumbrance or claim. Seller reserves the right to require Buyer submit a waiver and lien release in form and substance satisfactory to Seller from Buyer or any contractor of Buyer.

8.11   Buyer shall be responsible for any and all damage to Seller's Facility resulting from the acts and omissions by Buyer and their contractors. Buyer shall remove all of Buyer's equipment, materials, dunnage and debris and shall repair and restore Seller's Facility to the broom clean condition prior to Buyer's entrance upon Seller's Facility. Buyer, and its contractors, shall not interfere with or disrupt the terminal and cargo handling operations and activities at Seller's Facility.

10

8.12  Buyer shall not generate, dispose, bring, transport, or store (and shall prohibit all contractors from generating, disposing, bringing, transporting, or storing) any Hazardous Substances to or on Seller's Facility. Buyer shall be responsible for the management, prompt removal, cleanup and off-site disposal of Hazardous Substances (as defined below) brought to or generated by the Buyer or any contractor, including Hazardous Substances contained in the Equipment. In this regard, the Buyer and its contractors shall comply with Applicable Laws. Buyer shall have ownership of and title to all contaminated media created by it or its contractors or that Buyer is obligated to remediate, and shall have sole responsibility in responding to such conditions including providing for access restrictions and warnings, manifesting and any other obligations under Applicable Laws. When transporting, or arranging for the transportation of, Hazardous Substances, Buyer must provide insurance coverage for the transportation and/or disposal of such Hazardous Substances. MCS-90 Endorsement as required by the Federal Motor Carrier Act of 1980 as amended 1981 shall be provided. In addition, the Buyer shall provide Pollution Liability-Broadened Coverage Form (CA-9948) Endorsement. If (a) in the course of performing Buyer's Work, the Buyer encounters evidence of Hazardous Materials; (b) the Buyer becomes aware of any spill, disposal, discharge, or other release of Hazardous Materials, however or by whomever caused; or (c) the Buyer receives notice of investigation, notice of potentially responsible person states, request for information, demand for response action, or other inquiry, request, or demand, however identified, from any federal, state, or local governmental agency, department, or entity with respect to any activity on or condition that affects or allegedly affects human health or safety or the environment. Buyer shall immediately suspend Buyer's Work in the area affected and immediately orally report the condition to the Seller, followed as soon as reasonably possible by a written notice. In any such event, the obligations and duties of the Parties are as follows:

(i)     The Seller may direct the Buyer to take appropriate immediate mitigating action;

(ii)    to the extent such condition involves: (a) a Hazardous Substance introduced to Seller's Facility or created during the performance of Buyer's Work by the Buyer or its contractors; or (b) the exacerbation, spill, leak, release, or threatened release by Buyer or its contractors of a Hazardous Substance; (Hazardous Substances described in clauses (a) and (b) collectively, "**Buyer Hazardous Substances**"), then any investigation, response, removal, cleanup, or other remedial action required (1) to restore the Seller's Facility and/or (2) by applicable law or any governmental authorities (collectively, "**Environmental Action**") shall be performed by the Buyer or, at the Seller's option exercised in its sole discretion, by the Seller or another contractor to the Seller, and, in any event, the cost of such work shall be borne by the Buyer;

11

(iii)     except as otherwise required by Applicable Laws, notification and other communication with third parties, including governmental authorities, and reports and documentation related to such Environmental Action shall be undertaken by the Seller.

As used in this Section 8.12, "**Hazardous Substance**" means (a) any petroleum or petroleum products, flammable explosives, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation and transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls (PCBs); (b) any chemicals or other materials or substances which are now or hereafter become defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants" or words of similar import under any Applicable Laws; and (c) any other chemical or other material or substance, exposure to which is prohibited, limited or regulated by any governmental authority under any Applicable Laws.

8.13    Within fifteen (15) business days after the Effective Date, Buyer or its contractors, subcontractors, or suppliers shall furnish to Seller a performance bond (the "**Performance Bond**") in the amount of One Million U.S. Dollars ($1,000,000) in form and substance and from an issuer satisfactory to Seller in all respects as security for Buyer's obligations under this Agreement including, but not limited to, the proper and timely removal of the Equipment from Seller's Facility. Failure to furnish a performance bond shall be a default by Buyer under this Agreement.

9.    <u>Survival</u>.  The provisions of this Agreement shall survive termination or expiration of this Agreement.

10.    <u>Default</u>.  In the event of the failure of any Party under this Agreement to perform an obligation hereunder (a "**default**"), the non-defaulting Party shall provide written notice to the other Party of such alleged default. The defaulting Party shall have ten (10) days to cure such default unless extended in writing by the non-defaulting party. If such default has not been cured within such (10) day period (unless extended), then the defaulting Party shall be deemed to be in breach of this Agreement, and the non-defaulting Party shall be entitled to all applicable rights and remedies hereunder and at law and in equity (subject in all respects to Seller's limitation of liability set forth in Section 7.6 of this Agreement), including, but not limited to, the termination of this Agreement and, in the case of a Buyer default, the Seller's right to retain the Contract Price, collect and retain the Storage Costs, and enforce the Performance Bond.

Neither Party shall be deemed in breach or default of this Agreement, if either Party (or any of their third-party providers) fails to perform its obligations under this Agreement for reason caused by, or in connection with, a Force Majeure Event, as hereinafter defined. If a Force Majeure Event occurs, the Party (or its third-party provider) suspending

performance shall give prompt notice to the other Party and provide details on how the nonperforming Party is attempting to cure promptly the situation and advise when the suspension has ended. Upon cessation of the Force Majeure Event, the nonperforming Party (or its third-party provider) shall resume (or commence) as soon as reasonably practicable, unless otherwise mutually agreed otherwise by the Parties. If Buyer and its third-party contractor cannot resume activities after [ninety (90)] calendar days, either Party can terminate this Agreement by written notice to the other Party. Upon such termination Seller shall retain the Contract Price, the Equipment and collect and retain any Storage Costs theretofore incurred.

11. <u>Indemnity</u>.

11.1    [Intentionally Omitted.][8]

11.2    Buyer shall protect, defend, indemnify, and hold harmless Seller, its parent companies, affiliates and its and their respective directors, officers, agents, employees, insurers, successors and assigns, as well as the City of Long Beach, its Board of Harbor Commissions, individually and collectively, and their respective officers and employees (collectively, the "**Seller Indemnified Parties**") from and against all claims, lawsuits, costs (including reasonable attorneys' fees and court costs and other costs of suit), demands, damages, suits, judgments, penalties, environmental remediation or clean-up, fines, civil penalties, liabilities, debts, expenses, and causes of action of whatsoever nature or character, whether known or unknown, and whether arising out of contract, tort, strict liability, misrepresentation, violation of applicable law, and/or any cause whatsoever, including any release of hazardous or toxic material or a violation of any environmental law or regulation, which in any way arise out of, allege or are in any way related to (i) Buyer's duties and obligations under this Agreement, (ii) Buyer's Work or activities under this Agreement or otherwise pertaining to the Equipment or Seller's Facility including, but not limited to, the design, any dismantling, transport from the crane rails to the vessel removal, loading, transport and use and operation of the Equipment or (iii) the acts or omissions of Buyer, or any of its and their employees, contractors, representatives and agents. The indemnification rights set forth in this Section 11 do not constitute the sole and exclusive remedy of Seller or any of the Seller Indemnified Parties in respect of the matters addressed herein.

11.3    Buyer's obligation to indemnify Seller Indemnified Parties under this Section 11 will apply regardless of whether the claim arises in tort, negligence, contract, warranty, strict liability or otherwise. Seller shall have the right to defend its own interests at its separate cost and expense in connection with any such claim, loss, action, damage, expense or other liability, and its election to so defend its own interests shall in no way relieve Buyer of its indemnity obligations hereunder

13

Buyer's obligation to indemnify Seller Indemnified Parties under Section 11 shall survive the termination or expiration of this Agreement.

12.    Governing Law; Submission to Jurisdiction.[9]

12.1    This Agreement shall be governed by and construed in accordance with the laws of the State of California, without giving effect to the conflict of laws principles thereof that would direct the application of the laws of another jurisdiction. In the event of a dispute, the Parties shall first attempt to settle such dispute by mutual agreement. In the event either of the Parties determine that the dispute cannot be resolved by mutual agreement, the Parties agree that all disputes and matters whatsoever arising under, in connection or incident to this Agreement shall be resolved as set forth in Section 12.2. The Parties expressly waive the application of the United Nations Convention on Contracts for the International Sale of Goods to this Agreement.

12.2    Venue. Each of the Seller and the Buyer irrevocably agrees that any legal action or proceeding arising out of or relating to this Agreement brought by the any other party or its successors or assigns shall be brought and determined in any California state or federal court sitting in the City of Los Angeles (or, if such court lacks subject matter jurisdiction, in any appropriate California state or federal court), and each of the parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such action or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby. Each of the Seller and the Buyer agrees not to commence any action, suit or proceeding relating thereto except in the courts described above in California, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in California as described herein. Each of the Seller and the Buyer further agrees that notice as provided herein shall constitute sufficient service of process and such Parties further waive any argument that such service is insufficient. Each of the Seller and the Buyer hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby, (a) any claim that it is not personally subject to the jurisdiction of the courts in California as described herein for any reason, (b) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (c) that (i) the suit, action or proceeding in any such court is brought in an inconvenient forum, (ii) the venue of such suit, action or proceeding is improper or (iii) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.

14

13.    Binding Agreement.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and assigns.

14.    Force Majeure.  A "**Force Majeure Event**" means an exceptional event or circumstance which is beyond the reasonable control of either Party that cannot be remedied, avoided, mitigated or otherwise overcome by the commercially reasonable efforts by the Party claiming the Force Majeure Event and are not attributable to an act or omission of the Party claiming a Force Majeure Event, including: acts of God; acts of the public enemy; the confiscation or seizure by any government or public authority; insurrections; wars or war-like action; arrests or other restraints of government (civil or military); blockades; embargoes; strikes or lock-outs at the Seller's Facility; epidemics; landslides, earthquakes, fires, hurricanes, floods, or explosions; civil disturbance or disobedience, riot, sabotage, terrorism or threats of sabotage or terrorism; injunctions; or other governmental action. Notwithstanding the foregoing, the following events shall not be a Force Majeure Event:

    (i)    Bankruptcy, insolvency or liquidation of Buyer.

    (ii)    Any delay or failure on the part of the Third-Party Provider or any other of Buyer's or Third-Party Provider's sub-contractors or suppliers.

    (iii)    Any strike, lockout or industrial action affecting the Buyer.

    (iv)    Events that are foreseeable or avoidable.

    (v)    Events that are attributable to an act or omission of, including a breach of the Agreement by the Party claiming Force Majeure.

    (vi)    Events that do not negatively impact the progress of Buyer's Work.

    (vii)    Any event, the risk or consequence of which such Party has assumed under the Agreement, including, without limitation, the design requirements set forth in the Agreement.

    (viii)    Events at Buyer's terminal or events relating to Buyer's business, operations, or financial conditions.

    (ix)    Changes in general economic conditions such as inflation, interest rates or other factors of general application.

15.    Miscellaneous.

15.1    The failure of a Party to insist upon compliance with any term of this Agreement to exercise any option, enforce any right or seek any remedy shall not affect, nor constitute a waiver of that Party's right to insist upon strict compliance with any other term of this Agreement, to exercise any other option, enforce any other right or to seek any other remedy.

15.2    This Agreement forms the entire agreement between Seller and Buyer with respect to the subject matter contained in this Agreement. This Agreement supersedes all prior or contemporaneous discussions, negotiations, illustrations, representations, or agreements relating to the subject matter of this Agreement. No modification or amendment of this Agreement or Attachment hereto is effective unless confirmed in writing.

15.3    The Parties will, from time to time, do all further acts and execute and deliver all further documents as reasonably required to fully perform and carry out the terms of this Agreement.

15.4    If any court of competent jurisdiction determines that any term of this Agreement is invalid or unenforceable, that determination will not affect the validity of the other provisions of this Agreement, which will remain in full force and effect.

15.5    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement may be executed and delivered by the Parties by facsimile or electronic format (including portable document format (.pdf)), each of which when so executed and delivered shall be an original.

15.6    The representation, warranties, covenants and indemnities in this Agreement shall survive the purchase and sale of the Equipment.

15.7    The headings in this Agreement are for convenience only and shall not affect the construction of this Agreement.

15.8    Any written notice, direction, instruction, request or other communication required or permitted under this Agreement shall be deemed to have been duly given on the date of receipt (or if the receiving Party refuses delivery, then on the date of such refusal), and shall be delivered to the Party to whom notice is to be given: (a) personally; (b) by email (with transmission verified); or (c) by a recognized overnight delivery service with signature required; to the addressee at the address stated opposite its name below, or at the most recent address specified by written notice given to the other Party in the manner provided in this Section.

    If to SELLER:                ITS Container Terminal
                                 1281 Pier G E
                                 Long Beach, Ca. 90802
                                 Attention:   Graham Scott, CFO

16

Phone:        +1 (562) 590 6884
Email:        Graham.Scott@itslb.com

If to BUYER:              Tecnogruas
                          Av. Santa Maria 2670
                          Torre B
                          Santiago, Chile
                          Attention:  Alejandro Guzman
                          Phone:      56 9 9999 3012
                          Email:  alejandro.guzman@tecnogruas.cl

With copy to Facilitator:  Pacific Handling Systems, Inc.
                          21370 SW Langer Farms Parkway, Suite 142
                          Sherwood, Oregon 97140
                          Attn.: Michael Condon
                          Phone: 503 885-8281
                          Mobile: 503 799-4664
                          Email:  mike@pacifichandling.com



17

IN WITNESS WHEREOF, the parties hereto have executed this Crane Purchase and Sale Agreement as of the date and year first above set forth.

SELLER:

By _____

Name: ___Kim HOKERMAND___

Title: ___CEO___

BUYER:

By ___Algandro Grguici___

Name: _____

Title: ___Director General___

FACILITATOR:
PACIFIC HANDLING SYSTEMS, INC., signing for the limited purposes stated in Sections 2.2 and 2.3 of this Agreement exclusive between Buyer and Facilitator and for no other purpose.

By _____

Name: ___Mike Gordon___

Title: ___President___

18

**Attachment A**

| Operational Asset | Description | Local Designator/Model | Serial # | Date of MFR |
|---|---|---|---|---|
| QC | STS Gantry Crane | Paceco-1 | 2502 | 2003 |
| QC | STS Gantry Crane | Paceco-2 | 2767 | 2005 |
| QC | STS Gantry Crane | Paceco 3 | 2768 | 2005 |
| SPP | Container Spreader | SPP-M45T | 6676,6679,6699,6859 | 2003-2008 |
| SP | Spare Cargo beam -hook | SB-6 | | 2003 |

## ATTACHMENT B
## INSURANCE

3.1 (a) Commercial General Liability Insurance - comprehensive commercial general liability insurance covering death, personal injury or loss of or damage to any physical property arising out of or in connection with (i) the performance of the Agreement by Buyer or its contractors, agents, employees or representatives, (ii) any act or omission of the Buyer, or any of their respective contractors, agents, employees or representatives and/or (iii) Buyer's ownership, use and operation of the Equipment (such coverage to include premises and operations, broad form or blanket contractual liability, products/completed operations, death or personal injury, independent contractors, explosion/collapse/underground property damage (XCU), broad form property damage and debris/wreck removal) in amounts not less than $10,000,000 per occurrence and with deductibles not to exceed $100,000. The above insurance requirements may be met by any combination of primary and excess insurance coverage.

(b) Automobile Insurance - commercial automobile insurance in amounts not less than $5,000,000 per occurrence and with deductibles not to exceed $100,000 in respect of death, personal injury or loss of or damage to any physical property arising from the use of any motor vehicle (whether owned, non-owned, hired, leased or otherwise) in connection with this Agreement. The above insurance requirements may be met by any combination of primary and excess insurance coverage.

(c) Employers' Liability and Workers' Compensation Insurance - workers' compensation insurance with statutory benefits and limits in accordance with all state and federal requirements, including United States Longshore and Harbor Workers Compensation, and employers' liability insurance with limits not less than $1,000,000 per accident.

(d) Contractor's Pollution Liability Insurance – Contractor's pollution liability (CPL) insurance with coverage, for losses arising from or in any way related to sudden and accidental pollution conditions which arise from or in connection with this Agreement, in amounts not less than $2,000,000 per claim and $2,000,000 in the aggregate specific to the Agreement) and with a deductible not to exceed $100,000.

The CPL policy will, at a minimum, include coverage for bodily injury, property damage (including restoration or replacement costs), natural resource damage, environmental cleanup costs and legal defense costs arising from or in relation to pollution conditions that arise from or in connection with this Agreement, including any work or services performed by or on behalf of the Buyer.

(e) For any boats, barges, ships or other watercraft used in connection with the removal, loading and/or transport of the Cranes, Protection and Indemnity (P&I) Insurance and Hull Coverage with the running down clause covering such watercraft, as well as Charterers Legal Liability. The policy limit shall be no less than $5,000,000 for each accident and shall include coverage for Jones Act coverage for the masters and members of the crew, oil pollution and for wreck removal. The P&I policy shall be endorsed to name Seller and Port Long Beach as an additional insured. Such insurance shall be procured and maintained by Buyer's contractor owning or chartering the boat, barge, ship or watercraft, as the case may be.

(f) Property Insurance, including All Risks Erection and Installation Floater Policy including flood, wind and named storm, and coverage for the Equipment (including all components thereof), protecting the Seller from any loss or damage to any property, or any portion thereof. The Property Insurance shall be in an amount no less than the replacement value of the Equipment.

(g) Any other insurance coverages which may be required by applicable law.

Buyer, if it has any expatriate personnel, shall also take out and maintain at all relevant times a comprehensive insurance policy covering life, sickness and accident in respect of its expatriate personnel against these contingencies from whatever cause and shall indemnify and keep indemnified the Seller against any such claim.

3.2 Buyer, either directly or through its contractor or third party provider, will include each of the Seller, its parent companies, affiliates and its and their respective directors, officers, agents, employees, insurers, successors and assigns, as well as the City of Long Beach, its Board of Harbor Commissions, individually and collectively, and their respective officers and employees and, if requested by Seller, other parties identified by Seller, including, but not limited to, governmental agencies and units as an additional insured on its applicable liability insurance policies set forth in subsections (a), (b), (d) and (f) of Section 3.1 with appropriate policy endorsements. Such additional insured status shall be provided regardless of privity of contract between Seller and Buyer. All policies and certificates will contain and be endorsed to include an express waiver of the insurer's subrogation rights in favor of the Seller and other parties requested by Seller. All policies and certificates will contain a statement and be endorsed to include that Buyer's insurance is primary coverage to Seller and any other additional insureds and that any insurance coverage or self-insurance maintained by Seller or any of the additional insureds is excess and non-contributory for claims or losses. The policies shall also include a separation of insureds, severability of interests, or similar clause providing that, except for the limits of insurance and any specific rights or duties assigned to the first named insured, the coverage afforded applies separately to each insured against whom a claim is made or a suit is brought. Insurance shall be written on an occurrence basis unless otherwise expressly set forth in Section 3.1. Insurance certificates, including the form and content thereof, as well as the identity and rating of each insurer are subject to the prior written approval of Seller's Risk Manager.

3.3 The requirement that Buyer furnish specified minimum insurance coverages is not to be interpreted in any way as lessening or limiting the liability of Buyer, and/or any of Buyer's contractors under this Agreement, law or equity. Seller's acceptance of any insurance certificates shall not be deemed to be an acceptance, modification or waiver of Seller's rights with respect to any of Buyer's obligations under the Agreement, including, but not limited to, the insurance obligations hereunder.

3.4 No contractor shall be permitted to commence any work unless and until either (i) contractor shall have provided to Seller evidence that it maintains coverage of all insurance required under the Agreement or (ii) Buyer shall have provided evidence that it expressly covers such contractor under the insurance maintained by Buyer.

3.5 All policies will provide for thirty (30) days' prior written notice to the Seller of any cancellation, modification or non-renewal at the address designated for receipt of notices set forth in the Agreement. On the date hereof and on each date of update or renewal, Buyer will furnish the Seller with certificates of insurance, and the policy endorsements evidencing the insurance coverages and requirements required herein. Seller's acceptance of any insurance certificate shall not be deemed to be an acceptance, modification or waiver of Seller's rights or Buyer's obligations under this Agreement, including, but not limited to, Buyer's insurance obligations hereunder. If Buyer fails to produce such evidence of insurance, then the Seller shall have, in addition to all of its other rights and remedies under the Agreement, the option to terminate the Agreement or effect and keep in force such insurance without relieving the Buyer of any of their obligations under the Agreement and the premiums paid by the Seller will be for Buyer's account.

3.6 Unless otherwise expressly stated in a particular insurance coverage, Buyer shall maintain the

21

insurance coverages herein from the date three (3) business days following the Effective Date to and including the date the vessel upon which the Equipment is loaded has departed Seller's Facility and, also, Buyer has removed all of its equipment and materials.

## Attachment C
## Bill of Sale

**THIS BILL OF SALE** (this "Bill of Sale"), made as of this ___ day of ___, 2024 (the "Effective Date"), is given by, ITS Container Terminal, a California corporation ("Seller") to Tecnogruas a Chile registered entity ("Buyer").

## WITNESSETH

**WHEREAS**, Seller and Buyer are parties to a certain Crane Purchase and Sale Agreement dated as of ___, 2024 (the "Agreement"), pursuant to which Seller agreed to sell to Buyer, and Buyer agreed to purchase from Seller, the Equipment (capitalized terms not herein defined have the meaning ascribed thereto in the Agreement); and

**WHEREAS**, in connection with the requirements of Sections 1 and 7.2 of the Agreement, Seller is executing and delivering this Bill of Sale.

**NOW THEREFORE, KNOW ALL MEN BY THESE PRESENTS**, that Seller for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Agreement, does hereby sell, assign, transfer, convey and deliver to Buyer, free and clear of all claims and interests by or thru Seller, all of Seller's right, title and interest in and to the Equipment **TO HAVE AND TO HOLD** the same unto Buyer, its successors and assigns forever.

BUYER ACKNOWLEDGES AND AGREES THAT IT HAS INSPECTED THE EQUIPMENT AND ACCEPTS THE EQUIPMENT IN ITS ENTIRETY "AS IS" AND "WHERE IS" IN ITS CONDITION, WITH ANY AND ALL FAULTS OR DEFECTS, AND WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND FROM SELLER, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING WITHOUT LIMITATION ANY WARRANTY AS TO SUITABILITY, MERCHANTABILITY, CONDITION, QUALITY OR FITNESS, OR FITNESS FOR A PARTICULAR PURPOSE.

This Bill of Sale is subject to in all respects to the terms and conditions and other provisions that are set forth in the Agreement. In the event of any conflict or inconsistency between this Bill of Sale and the Agreement, the Agreement will take precedence.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of California, without giving effect to the conflict of laws principles thereof that would direct the application of the laws of another jurisdiction. The parties expressly waive the application of the United Nations Convention on Contracts for the International Sale of Goods to this Bill of Sale.

*[Signature page follows]*

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed as of the date first written above.

SELLER:

By_____

Name:_____
Title:_____

## ATTACHMENT D
## SCHEDULE OF BUYER'S WORK

The WORKS Plan discussed with the Contractor, and commissioned to the Contractor follow the below mentioned dates.

The same, in line and considered for the fulfillment of WORKS in the AGREEMENT, are:

1.  Signature of Acquisition Agreement
2.  Signature of HEAVY Lift Contractor (on or before April 15, 2024)
3.  Engineering calculations, Mobilization Equipment determination, and approval- see attached
4.  Mobilization of HEAVY Lift Contractor, to ITS Facilities- see attached
5.  Mobilization of Sea Vessel to pick-up Cranes in ITS Facilities- see attached
6.  LOADING of cranes unto Sea Vessel- see attached
7.  Sea Vessel DEPARTING from Long Beach to Ecuador; (no later than ~~September 30th, 2024~~ October 31st, 2024 *HR*



### SCHEDULE

1. Start field work          6-29
2. Vessel ETA                7-29
3. Load first crane          8-02
4. Load last Crane           8-09
5. Shift for final lashing   8-09
6. Departure                 8-23

Note-Preliminary after 5% design

### NOTES

1. No work over Power substation
2. 6 days at loading location-
adjust to vessel berthing
3. ITS Maint. crew to drive cranes
within work area as needed
4. ITS Maint. crew to drive cranes
into storm stops when needed.

**POSITION 3-Berth 235**
Final lashing



**POSITION 2-Berth 236**
6 days - adjust to vessel berthing

**POSITION 1-Berth 236**
Crane positions may change,
Total space will not.


NORDHOLM COMPANIES, INC
https://nordholmcompanies.com/

| CONTRACTOR Nordholm Companies, Inc. | PROJECT **ITS Cranes to Guayaquil** | Drawn MBB | Ckd GEN | App GEN | Scale 1" = 80' |
| --- | --- | --- | --- | --- | --- |
| **GREGORY E. NORDHOLM, PS** | CLIENT **Technogruas** | Project No. P24-006 | | | Date 03/29/24 |
| ENGINEERED BY 4116 34th Avenue NE #B  Everett, WA 98205  Office (425) 259-0213  Fax (425) 252-0477 | TITLE PREP | Drawing No. 1000 | | Sheet 1 of 1 | Rev 3 |



EXHIBIT 2

## CONTRATO DE SERVICIOS PORTUARIOS

Conste por el presente documento, el Contrato de Servicios Portuarios que se celebra al tenor de las siguientes cláusulas:

     <u>Primera: Partes que Intervienen</u>.  Comparecen a la celebración de este contrato:

(a)     La Compañía Naportec S.A., debidamente representada por su Presidente y Gerente General, señor Sergio Murillo Bustamante y señorita Lidia Cevallos Salcedo, respectivamente, parte a la que de aquí en adelante se podrá llamar simplemente "NAPORTEC"; y,

(b)     La Compañía Inverequipos S.A., debidamente representada por su Presidente, señor Escándar Alejandro Guzmán Ayub, parte a la que de aquí en adelante se podrá llamar simplemente "INVEREQUIPOS".

     <u>Segunda: Antecedentes</u>.     (a)     NAPORTEC es la operadora del puerto privado conocido como BANANAPUERTO, que se encuentra ubicado en la Isla Trinitaria de la ciudad de Guayaquil, al final de la intersección de la Avenida de los Ángeles y el kilómetro 1.5 de la Vía Perimetral (de aquí en adelante simplemente "BANANAPUERTO").



(b)     INVEREQUIPOS por su parte, es una empresa dedicada a la prestación de servicios logísticos y de operación de grúas a puertos.

(c)     NAPORTEC tiene un muelle de trescientos sesenta metros de longitud, con capacidad para atender a dos buques a la vez, y requiere contratar los servicios de una compañía que cuente inicialmente con 2 grúas ship-to-shore ("STS") y una grúa móvil, y posteriormente, según se indica en este contrato, 5 grúas ship-to-shore ("los Equipos"), para la carga y descarga de mercancías y contenedores de los buques que atraquen en el muelle de BANANAPUERTO.

(d)     Con fecha 12 de febrero de 2019, NAPORTEC e INVEREQUIPOS celebraron un Contrato de Servicios Portuarios mediante el cual INVEREQUIPOS se comprometió a prestar servicios portuarios con dos grúas STS y una grúa móvil por el plazo de tres años contados a partir de la puesta en marcha de dichos Equipos en BANANAPUERTO, a satisfacción de NAPORTEC.



(e)     Con fecha 22 de octubre de 2020, NAPORTEC e INVEREQUIPOS suscribieron un Adendum Modificatorio al Contrato de Servicios Portuarios mediante el cual, entre otras cosas, se amplió el plazo de duración del Contrato de Servicios Portuarios hasta el 20 de febrero de 2024, renovable automáticamente por dos años más, a menos que una de las partes notifique por escrito a la otra su voluntad de no renovar con por lo menos un año de anticipación al vencimiento del

contrato. Las partes reconocen y aceptan que el plazo del Contrato de Servicios Portuarios del 12 de febrero de 2019 se renovó automáticamente y que vencerá el 12 de febrero de 2026.

(f)      Con fecha 31 de enero de 2024, NAPORTEC e INVEREQUIPOS suscribieron un Segundo Adendum Modificatorio al Contrato de Servicios Portuarios mediante el cual, se reformaron las Cláusulas Tercera literal (b) y Quinta literal (a).

(g)      Con fecha primero de febrero de 2024, las partes suscribieron otro Contrato de Servicios Portuarios, mediante el cual INVEREQUIPOS se comprometió a prestar servicios a NAPORTEC con una grúa móvil.

(f)      Las partes desean suscribir un nuevo Contrato de Servicios Portuarios que reemplace y deje sin efecto el Contrato del 12 de febrero de 2019, que vence el 12 de febrero de 2026 (así como sus Adendums del 22 de octubre de 2020 y 31 de enero de 2024) y el Contrato de Servicios Portuarios del primero de febrero de 2024.

Tercera: Objeto. *Servicios.* Con estos antecedentes, se celebra este contrato mediante el cual INVEREQUIPOS se compromete y obliga a prestar servicios portuarios a NAPORTEC, en BANANAPUERTO, de carga y descarga de contenedores llenos y vacíos, así como de otras cargas y mercaderías, incluyendo pero no limitándose a flat racks, open tops e ISO tanques, de buque a tierra o a cualquier medio de transporte y viceversa, con personal suyo o subcontratado por ella y con los equipos de su propiedad, exclusivamente para NAPORTEC, por el precio, plazo, y bajo los demás términos y condiciones que se establecen en este contrato.

(b) *Equipos.* Para poder cumplir con los servicios objeto de este contrato, INVEREQUIPOS se compromete y obliga a instalar enteramente a su costo los Equipos en BANANAPUERTO, esto es grúas pórticos portuarias tipo Post Panamax de un alcance de 18+ 1 contenedores de las características y especificaciones que se indican en el Anexo 1. Los Equipos deberán estar instalados y en funcionamiento a satisfacción de Naportec en las siguientes fechas: (i) dos grúas STS y una grúa móvil a la firma de este Contrato. Al respecto las partes reconoces y aceptan que las mismas ya están instaladas y operando en BANANAPUERTO en esta fecha; y (ii) tres grúas adicionales STS en febrero de 2025. Al respecto las partes reconocen y aceptan que, para cumplir con lo indicado, INVEREQUIPOS deberá instalar y poner en funcionamiento en BANANAPUERTO para la fecha indicada, tres grúas STS adicionales de alcance 22 contenedores, a las dos grúas STS y una grúa móvil que ya se encuentran en funcionamiento.

(c) Adicionalmente, INVEREQUIPOS se compromete: (i) a proporcionar a NAPORTEC los manuales del fabricante de las grúas con las que prestará los servicios materia de este contrato, sobre la operatividad de las mismas y los certificados que acrediten la capacitación del personal encargado de operar las mencionadas grúas; (ii) a seguir estrictamente las disposiciones y normas de seguridad de BANANAPUERTO, así como la planificación de muelles y de movimiento y



traslado de grúas de NAPORTEC; (iii) a cumplir con el pago de todos los gastos que fuesen necesarios para instalar y poner los Equipos en funcionamiento en BANANAPUERTO, incluyendo pero no limitándose al transporte de las tres grúas desde su lugar de origen hasta BANANAPUERTO, derechos arancelarios y demás impuestos que puedan generarse con relación a la importación o nacionalización de las grúas con las que prestará los servicios materia de este contrato durante todo el plazo de duración del mismo, ya sean dichos gastos de cargo de INVEREQUIPOS; (iv) a dar mantenimiento preventivo y correctivo a los Equipos, enteramente a su costo, siguiendo las recomendaciones de los fabricantes y según los cronogramas que oportunamente se acuerden entre NAPORTEC e INVEREQUIPOS, de manera que siempre hayan dos grúas ciento por ciento operativas en BANANAPUERTO por el primer año, y cuatro grúas ciento por ciento operativas en BANANAPUERTO a partir del segundo año; y (v) a instalar en, y retirar las grúas de BANANAPUERTO, enteramente a su costo, de conformidad a lo dispuesto en el literal (d) de la Cláusula Quinta de este contrato.

Cuarta: Costo, Cálculo y Forma de Pago de los Servicios,

(a) *Precio*. Las partes convienen que el precio NAPORTEC pagará a INVEREQUIPOS por los servicios materia de este contrato desde la presente fecha, será de US$38.00 (Treinta y Ocho dólares de los Estados Unidos de América) más IVA por cada movimiento de contenedor o mercadería entendiéndose como tal la carga de un contenedor o mercadería desde el muelle de BANANAPUERTO o medio de transporte al buque, o la descarga de un contenedor desde un buque al muelle o a cualquier medio de transporte. A partir del segundo año de vigencia de este contrato, es decir desde el 13 de febrero de 2025, la tarifa se incrementará anualmente en el porcentaje promedio de los índices de inflación de Ecuador y Estados Unidos de América. 

(b) *Mínimo de Movimientos Mensuales y Anuales*. (i) <u>Primer Año</u>: Las partes convienen en que el valor acordado por movimiento de US$38.00 (Treinta y Ocho dólares de los Estados Unidos de América) más IVA, se mantendrá durante el primer año de vigencia de este Contrato, siempre y cuando NAPORTEC utilice 8,333 (ocho mil trescientos treinta y tres) o más movimientos al mes, o 100,000 (cien mil) movimientos al año, para el primer año de vigencia de este Contrato. En el caso de que NAPORTEC utilice menos de 8.333 (ocho mil trescientos treinta y tres) movimientos en un mes, la tarifa mensual será el resultado de dividir US$316,666 (Trescientos Dieciséis Mil Seiscientos Sesenta y Seis dólares de los Estados Unidos de América) para el número de movimientos efectuados en el mes. Si NAPORTEC utilizare 100.000 (cien mil) movimientos antes de cumplirse el año, el canon mensual de ajustará de manera que el total de movimientos acumulados a la fecha no superen una tarifa de USD38 por movimiento. 

(ii) <u>Segundo Año y en Adelante:</u> Las partes convienen a partir del segundo año, y para cada año subsiguiente durante la vigencia de este Contrato, el valor por movimiento será de US$38.00 (Treinta y Ocho Dólares de los Estados Unidos de América), o la tarifa del año anterior para el 

tercer año en adelante, más el porcentaje promedio de la inflación de Ecuador y Estados Unidos de América del año, más IVA, siempre y cuando NAPORTEC utilice 16,667 (dieciséis mil seiscientos sesenta y siete) o más movimientos al mes, o 200.000 (doscientos mil) movimientos al año. En el caso de que NAPORTEC utilice menos de 16,667 (dieciséis mil seiscientos sesenta y siete) movimientos en un mes, la tarifa mensual será la siguiente:

Tarifa Mensual =     [(16,667) x (Tarifa Año Anterior x % Promedio de la Inflación de EC y EE. UU.)] / Movimientos del Mes

Si NAPORTEC utilizare 200,000 (doscientos mil) movimientos antes de cumplirse el año, el canon mensual se ajustará de manera que el total de movimientos acumulados a la fecha no superen una tarifa de USD38 por movimiento, o la tarifa del año anterior para el tercer año en adelante, más el porcentaje promedio de la inflación de Ecuador y Estados Unidos de América del año, más IVA.

c) *Facturación y Pago*. La facturación de los servicios prestados por INVEREQUIPOS se realizará por periodos mensuales desde la fecha de inicio de operaciones, de acuerdo a los reportes de trabajo diarios que deberán ser firmados por los operadores de los Equipos de INVEREQUIPOS, y por el representante de NAPORTEC designado para el efecto. INVEREQUIPOS preparará un reporte valorado de los servicios prestados en el mes, el mismo que deberá ser revisado y en su caso aprobado u objetado por NAPORTEC dentro de los tres primeros días luego de su presentación por parte de INVEREQUIPOS. Luego de aprobado el reporte valorado de servicios, INVEREQUIPOS emitirá y presentará la respectiva factura, la cual será pagada por LA ARRENDATARIA dentro de los 30 días calendario siguientes a la fecha de entrega de la misma. 

(d) *Heavy Lifting*. En caso de que la grúa requiera ser utilizada para Heavy lifting u otro propósito, los valores por movimiento serán previamente acordados por las partes.

(e) *Cobertura de Inverequipos*. INVEREQUIPOS por su parte, garantiza a NAPORTEC que luego del plazo para la instalación y puesta en funcionamiento de los Equipos establecido en el literal (b) de la Cláusula Tercera de este Contrato, y durante la vigencia del mismo, siempre tendrá dos de las tres grúas para el primer año o cuatro de las seis para el segundo año en adelante, operativas y en perfecto estado de funcionamiento en BANANAPUERTO, y que cada una de ellas efectuará treinta movimientos por hora o más. NAPORTEC se compromete a mantener un abastecimiento de contenedores desde el patio al muelle y grúas de al menos 10 contenedores por hora por grúa. Las partes convienen que los costos en que NAPORTEC tuviere que incurrir para movilizar la carga en caso de que INVEREQUIPOS no tuviere dos grúas operativas con capacidad de treinta movimientos por hora durante el primer año, o cuatro grúas operativas con capacidad de treinta movimientos por hora a partir del segundo año serán cubiertos por INVEREQUIPOS.  

(f) *Servicios*. NAPORTEC acepta que el costo de la energía eléctrica por la operación de las grúas correrá por cuenta suya. Además, acepta conceder un espacio dentro del puerto donde INVEREQUIPOS pueda tener a lo menos dos contendores, destinados a una instalación de mantenimiento para las grúas.

Quinta: Plazo de Duración. (a) El plazo de duración de este contrato es de cuatro años contados a partir de la presente fecha, el mismo que se renovará automáticamente por dos años más, a menos que una de las partes notifique por escrito a la otra su voluntad de no renovar el contrato con por lo menos un año de anticipación a su vencimiento.

(b) El presente contrato podrá darse por terminado antes del cumplimiento del plazo del mismo, por el mutuo acuerdo de las partes, o por incumplimiento de obligaciones de una de las partes.

(c) En caso de que NAPORTEC decidiera terminar el presente contrato unilateralmente y sin causa, antes del plazo original de cuatro años, deberá pagar a la INVEREQUIPOS un valor equivalente al 50% de los movimientos mensuales mínimos restantes hasta la terminación de los cuatro primeros años. Así mismo, si NAPORTEC decidiera terminar el presente contrato unilateralmente y sin causa, después del plazo original de cuatro años, pero antes del plazo adicional de dos años, deberá pagar a INVEREQUIPOS un valor equivalente al 50% de los movimientos mensuales mínimos restantes hasta la terminación de dichos dos años adicionales.



(d) Una vez terminado el Contrato, NAPORTEC permitirá la permanencia de todos los equipos en BANANAPUERTO hasta por un máximo de 180 días si la finalización es unilateral y 90 días si es dentro del plazo acordado, para que INVEREQUIPOS proceda a retirarlos, enteramente a su costo.

Sexta: Declaraciones Especiales. (a) *Responsabilidad Laboral*. Las partes declaran de manera expresa que INVEREQUIPOS y sus trabajadores, empleados, funcionarios, colaboradores, o dependientes, no tienen vinculación laboral alguna, directa ni indirecta, con NAPORTEC. Por tanto, NAPORTEC no adquiere ni contrae obligación alguna de tipo laboral con respecto a INVEREQUIPOS, sus empleados, trabajadores, funcionarios, o personas vinculadas a ella, siendo obligación y responsabilidad de INVEREQUIPOS cancelar a sus empleados y trabajadores todos los valores a los que por ley y por los respectivos contratos de trabajo tengan derecho, incluyendo pero no limitándose sueldos, beneficios sociales, indemnizaciones por accidentes de trabajo o despido intempestivo, remuneraciones, pagos por terminación del contrato y demás beneficios adicionales de carácter laboral de cualquier índole.



5

Si llegare a presentarse por parte de algún trabajador, empleado, funcionario, o persona relacionada a INVEREQUIPOS, cualquier reclamo contra NAPORTEC ante la autoridad competente, INVEREQUIPOS se obliga a asumir todos los costos de la defensa de NAPORTEC en que hubiere que incurrir hasta la conclusión del trámite, y a rembolsar cualquier gasto que NAPORTEC se vea obligado a incurrir con motivo de dicho reclamo y su respectiva defensa, dentro de cinco días hábiles desde la fecha en que NAPORTEC le dé aviso.

Además, si cualquier eventual reclamo judicial o extrajudicial presentado por un empleado de INVEREQUIPOS resultare en un fallo ejecutoriado en contra de NAPORTEC o de alguno de sus funcionarios, empleados o ejecutivos, en virtud del cual cualquiera de ellos o NAPORTEC fuera obligada a hacer el pago de cualquier cantidad de dinero a favor del empleado reclamante, INVEREQUIPOS se obliga a proveer a NAPORTEC, sus funcionarios, empleados o ejecutivos que hubieren sido condenados a realizar el pago antes referido, en forma oportuna, la suma de dinero requerida para completar dicho pago, para lo cual bastará la simple afirmación de NAPORTEC, en cuanto al hecho y al monto del pago. Si INVEREQUIPOS no cumpliere con proveer la suma de dinero antes referida, se obliga a reembolsarla íntegramente y a pagar, adicionalmente, la tasa máxima de interés convencional permitida legalmente en el Ecuador y calculada sobre la suma de dinero no entregada desde la fecha en que NAPORTEC, alguno de sus funcionarios, empleados, o ejecutivos hubieren pagado al trabajador o empleado reclamante, hasta la fecha en que INVEREQUIPOS cumpla con rembolsar ese dinero. En caso de que se dispongan medidas cautelares contra NAPORTEC, alguno de sus funcionarios, empleados o ejecutivos, será de obligación de INVEREQUIPOS proveer, en forma oportuna, el dinero necesario para consignar los valores y hacer cesar la medida. Así mismo, en caso de que por cualquier motivo una autoridad administrativa o judicial declare que algún trabajador de INVEREQUIPOS debe ser asumido por NAPORTEC, INVEREQUIPOS se compromete a restituir a NAPORTEC el valor de la indemnización por despido intempestivo de dicho trabajador.



De igual forma, NAPORTEC declara que sus empleados, funcionarios, dependientes o cualquier persona vinculada a su negocio, no tiene relación laboral alguna con INVEREQUIPOS, y que, por lo tanto, es exclusiva obligación y responsabilidad de NAPORTEC cancelar a sus empleados y trabajadores todos los valores a los que por ley y los respectivos contratos de trabajo tengan derecho, incluyendo pero no limitándose sueldos, beneficios sociales, indemnizaciones por accidentes de trabajo o despido intempestivo, remuneraciones, pagos por terminación del contrato y demás beneficios adicionales de carácter laboral. De esta manera, ante la eventualidad de cualquier reclamo laboral o demanda laboral de parte de los empleados, funcionarios, dependientes o cualquier persona vinculada a NAPORTEC, en contra INVEREQUIPOS, o de que se ejecutorie una declaración judicial o administrativa el pago de cualquier indemnización laboral en contra INVEREQUIPOS, por demanda o reclamo de trabajadores, funcionarios, dependientes o personas vinculadas a NAPORTEC, dichos pagos serán asumidos por NAPORTEC, incluyendo los costos



legales en que hubiere incurrido INVEREQUIPOS para defenderse de los reclamos presentados en su contra por trabajadores de NAPORTEC.

(b) *Responsabilidad Civil*. INVEREQUIPOS expresamente se compromete y obliga: (i) a mantener en vigencia una póliza de responsabilidad civil que cubra por hasta $1,000,000.00 (Un Millón de Dólares de los Estados Unidos de América) los daños a la propiedad o a las personas, que se pudiesen producir como consecuencia de su prestación de servicios y operación de los Equipos en BANANAPUERTO, y (ii) a indemnizar a NAPORTEC ante cualquier eventual reclamo judicial o extrajudicial por daños a las cosas o a las personas causados como consecuencia de su operación de los Equipos en BANANAPUERTO, que resultare en un fallo ejecutoriado en contra de NAPORTEC o de alguno de sus funcionarios, empleados o ejecutivos, en virtud del cual cualquiera de ellos o si NAPORTEC fuera obligada a hacer el pago de cualquier cantidad de dinero a favor del reclamante, caso en el cual INVEREQUIPOS se obliga a proveer a NAPORTEC, sus funcionarios, empleados o ejecutivos que hubieren sido condenados a realizar el pago antes referido, en forma oportuna, la suma de dinero requerida para completar dicho pago, para lo cual bastará la simple afirmación de NAPORTEC, en cuanto al hecho y al monto del pago. Si INVEREQUIPOS no cumpliere con proveer la suma de dinero antes referida, se obliga a reembolsarla íntegramente y a pagar, adicionalmente, la tasa máxima de interés convencional permitida legalmente en el Ecuador y calculada sobre la suma de dinero no entregada desde la fecha en que NAPORTEC, alguno de sus funcionarios, empleados, o ejecutivos hubieren pagado al reclamante, hasta la fecha en que INVEREQUIPOS cumpla con rembolsar ese dinero. En caso de que se dispongan medidas cautelares contra NAPORTEC, alguno de sus funcionarios, empleados o ejecutivos, será de obligación de INVEREQUIPOS proveer, en forma oportuna, el dinero necesario para consignar los valores y hacer cesar la medida. 

(c) *Permisos*.        Finalmente, INVEREQUIPOS declara que cuenta con todos los permisos y autorizaciones gubernamentales necesarios para prestar los servicios materia de este contrato a NAPORTEC, sin embargo de lo cual expresamente se compromete a indemnizar a NAPORTEC por cualquier sanción que le impusiera a NAPORTEC el Ministerio de Trabajo, Ministerio de Transporte y Obras Públicas (MTOP), Subsecretaría de Transporte Marítimo y Fluvial (SPTMF), Ministerio de Ambiente del Ecuador (MAE), Servicio Nacional de Aduanas del Ecuador (SENAE), Muy Ilustre Municipalidad de Guayaquil, o cualquier otra institución del gobierno nacional o local, como consecuencia de que INVEREQUIPOS no cuente con algún permiso o registro que la respectiva autoridad gubernamental considere necesaria para la prestación de servicios materia de este contrato.  

(d) *Ejemplares*. Las partes convienen en que el presente contrato podrá ser suscrito en distintos lugares y en ejemplares separados, los mismos que al juntarse y suscribirse por la otra parte constituirán uno y el mismo contrato.

7

(e) *Cesión de Derechos*. Ninguna de las partes podrá ceder sus derechos bajo este contrato sin la autorización de la otra parte.

(f) *Jurisdicción y Competencia*. El presente contrato se regirá por las leyes de la República del Ecuador. Las partes declaran que se someten a los jueces civiles de la ciudad de Guayaquil y al procedimiento sumario para la solución de cualquier controversia que surja de la interpretación o aplicación de este contrato.

(g) *Acuerdo Completo*.  Este Contrato representa el acuerdo completo de las partes reemplaza y deja sin efecto en todas sus partes el Contrato de Servicios Portuarios del 12 de febrero de 2019, sus Adendums Modificatorios del 22 de octubre de 2020 y enero 31 de 2024, así como el Contrato de Servicios Portuarios del primero de febrero de 2024, y todo y cualquier convenio o acuerdo anterior a esta fecha, ya sea oral o escrito, referente al objeto materia de este Contrato.

Para constancia de todo lo cual las partes suscriben este contrato en las ciudades de Guayaquil, Ecuador, y Cartagena, Colombia, respectivamente, a los 13 días del mes de marzo de 2024.

| p. NAPORTEC S.A. | Lidia Cevallos Salcedo |
|---|---|
| Sergio Murillo Bustamante | Gerente General |
| Presidente | |

p. INVEREQUIPOS S.A.

Escándar Alejandro Guzmán Ayub
Gerente General

Política Corporativa DOLE

Iván Wong Chang

8